**CIVIL ACTION COVER SHEET**

**20-0251F**

**Trial Court of Massachusetts**
**The Superior Court**

| | |
|---|---|
| PLAINTIFF(S): SYED K. RAFI, PhD. | COUNTY |
| ADDRESS: 3237 APEX CIR, FALLS CHURCH, VA. 22044 | SUFFOLK |

DEFENDANT(S): • HARVARD MEDICAL SCHOOL;
• BRIGHAM & WOMEN'S HOSPITAL; DR. MORTON; DR MA
• CHILDREN'S HOSPITAL BOSTON; DR. IRONS
• MASSACHUSETTS GENERAL HOSPITAL; DR. MacDONALD

ATTORNEY:

ADDRESS: ADDRESS: • 75 FRANCIS STREET, BOSTON, MA. 0211
• 25 SHATTUCK ST., BOSTON, MA. 02115.
• 55-FRUIT STREET, BOSTON, MA. 02114.

BBO: • 300 LONGWOOD AVE, BOSTON. MA. 02115.

| CODE NO. | TYPE OF ACTION AND TRACK DESIGNATION (see reverse side) | | |
|---|---|---|---|
| | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
| B99 | 42 U.S.C. SECTIONS 1985 & 1986. | F | ☒ YES ☐ NO |

*"If "Other" please describe:

Is there a claim under G.L. c. 93A?
☐ YES ☒ NO

Is this a class action under Mass. R. Civ. P. 23?
☐ YES ☒ NO

**STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A**

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff's counsel relies to determine money damages.
For this form, disregard double or treble damage claims; indicate single damages only.

**TORT CLAIMS**
(attach additional sheets as necessary)

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED

JAN 27 2020

MICHAEL JOSEPH DONOVAN
CLERK OF COURT

A. Documented medical expenses to date:
1. Total hospital expenses ........................ $
2. Total doctor expenses .......................... $
3. Total chiropractic expenses .................... $
4. Total physical therapy expenses ............... $
5. Total other expenses (describe below) .......... $
Subtotal (A): $

B. Documented lost wages and compensation to date *PLEASE SEE ATTACHED SHEETS: PAGES 1 & 2* $
C. Documented property damages to date ........... $
D. Reasonably anticipated future medical and hospital expenses *PAGES 1 & 2* $
E. Reasonably anticipated lost wages ............. *PLEASE SEE ATTACHED SHEETS:* $
F. Other documented items of damages (describe below) *PLEASE SEE ATTACHED SHEETS: PAGES 1 & 2* $

G. Briefly describe plaintiff's injury, including the nature and extent of injury:

• *PLEASE SEE ATTACHED SHEETS: PAGE-3.* TOTAL (A-F):$

**CONTRACT CLAIMS**
(attach additional sheets as necessary)

☐ This action includes a claim involving collection of a debt incurred pursuant to a revolving credit agreement. Mass. R. Civ. P. 8.1(a).
Provide a detailed description of claim(s):

TOTAL: $

Signature of Attorney/ Unrepresented Plaintiff: X *S. Syed Rafi (PRO.se)* Date: 01/20/2020

RELATED ACTIONS: Please provide the case number, case name, and county of any related actions pending in the Superior Court.
*NONE IN THE SUPERIOR COURT.*

**CERTIFICATION PURSUANT TO SJC RULE 1:18**
I hereby certify that I have complied with requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

Signature of Attorney of Record: X                     Date:

**STATE OF MASSACHUSETTS**
**Suffolk County Superior Court**

SYED K. RAFI, Ph.D.
*Plaintiff*
    v.
HARVARD UNIVERSITY MEDICAL SCHOOL:
  BRIGHAM AND WOMEN'S HOSPITAL
  CYNTHIA C. MORTON, Ph.D.
  RICHARD L. MAAS, MD., Ph.D.
  MASSACHUSETTS GENERAL HOSPITAL
  MARCY E. MACDONALD, Ph.D.
  CHILDREN'S HOSPITAL BOSTON
  MIRA B. IRONS, MD.:
*Defendants*

Civil Action No: 20-0251 F

1 | **RACE AND CLASS- BASED CONSPIRATORIAL COLLUSION,**
2 | **CONTINUING COERCIVE EMPLOYMENT REPRISALS AND**
3 | **IT'S WORSENING CONTINUING DETRIMENTAL *"DOMINO EFFECTS"*--**
4 | **COMPLAINT**
5 |
6 | *Pro Se* plaintiff, Dr. Syed Rafi moves this Court for entry of judgment in his favor against the
7 | defendants for:
8 |     (1) The alleged race / class based conspiratorial collusion with Yale School of Medicine,
9 |         and
10 |     (2) For the unlawful neglect / refusal to prevent the continuing conspiratorial negative
11 |         interference in employment opportunities at Harvard Medical School affiliated
12 |         Brigham and Women's Hospital, Children's Hospital Boston and Massachusetts
13 |         General Hospital from 2003 through 2020.
14 |
15 | <u>NATURE OF ACTION</u>
16 |     *I.* **42 U.S.C. § 1985** - *Conspiracy to Interfere with Civil Rights and Constitutional*
17 |         *Rights.*
18 |     *2.* **42 U.S.C § 1986** - *Unlawful to Neglect or Refuse to Prevent Conspiracy to Interfere*
19 |         *with Civil Rights and Constitutional Rights.*
20 |
21 | • *Seeking compensation* under **42 U.S.C. § 1985(3)** for the alleged continuing unlawful race
22 |   and class- based conspiratorial conspiracy to interfere with Dr. Rafi's (*plaintiff*) Civil Rights
23 |   and Constitutional Rights.
24 |
25 | • *Seeking compensation* under **42 U.S.C § 1986** for the alleged continuing unlawful neglect or
26 |   refusal to prevent the illegal race and class based conspiratorial coercive and/or vindictive
27 |   negative interference in employment opportunities in violation of Civil Rights and
28 |   Constitutional Rights.
29 |
30 |
31 |

1   **I.**    **42 U.S.C. § 1985 - Conspiracy to Interfere with Civil Rights and Constitutional Rights**

2         In the wake of the civil war, congress enacted the Civil Rights Act of 1871 to enforce the

3   13th, and 14th Amendments to the constitution, which prohibited slavery and enshrined equal

4   protection and voting rights in the constitution.  They were designed to provide remedies to

5   individuals deprived of their civil rights and to protect individuals from a wide range of

6   discriminatory conduct.  The relevant provision includes 42 U.S.C. Section 1985, which provides

7   a remedy in cases involving conspiracy to interfere with civil rights and federal constitutional

8   rights.

9         If one or more persons engaged therein do, or cause to be done, any act in furtherance of

10  the object of such conspiracy, whereby another is injured  in his person or property, or deprived of

11  having and exercising any right or privilege of a citizen of the United States, the party so injured

12  or deprived may have an action for the recovery of damages occasioned  by such injury or

13  deprivation, against anyone or more of the conspirators.

14        Section 1985 is best known for its remedial clause: § 1985(3) [cl.1].  Additionally, there

15  are five substantive clauses each protecting broadly delineated rights against conspiratorial

16  conduct.

17  **A.**    **Denial of Equal Rights:**

18        **Three of §1985's clauses provide a private, civil remedy for the denial of equal rights**

19        **when some invidious, class-based animus is behind the defendants' actions:**

20      *1.*    *§1985 (3) [cl.1]- Equal Protection and Equal Privileges and Immunities:*

21  *This clause "provides a remedy for violation of the rights" designated in the law:*

22  *(a)   Federal Constitutional Rights:*

23

1        *i.*     ***Private Conspiracies:***

2              ***Section 1985(3) [cl.1] provides a remedy for wholly private action which violates***

3              ***the 13th Amendment right to be free from the "bandages and incidents of***

4              ***slavery". <u>Virtually any racially motivated interference with a person's legal right***</u>

5              ***<u>is actionable.***</u>

6        *For example, the ability to engage in interstate travel is prohibited from interference by*

7 *wholly private actions, as are other discrete rights identified by the Supreme Court as among the*

8 *privileges and immunities of national citizenship (See, Griffin v. Breckenridge, 403 U.S. at 105-06*

9 *(right to interstate travel). Congressional authority to grant a remedy for private violations of*

10 *these rights lies in the Necessary and Proper Clause, U.S. Constitution- article I, § 8, cl. 18.*

11        *(b) Federal Statutory Rights:*

12        ***By its terms, § 1985 (3) [cl.1] provides a remedy for violations of federal statutory rights,***

13 ***including claims involving wholly private conspiracies. Section 1985 is designated to give the***

14 ***injured party an opportunity to recover damages against anyone or more of the conspirators.***

15        ***<u>Thus, U.S.C.§ 1985(3), in principal effect, provides a specific tort law available to attack***</u>

16 ***<u>conspiratorial discrimination based on race and class, and it also provides for joint and several***</u>

17 ***<u>liabilities for members of the conspiracy.***</u>

18 **II.    <u>42 U.S.C § 1986 - Unlawful to Neglect or Refuse to Prevent Conspiracy to Interfere with**</u>

19        **<u>Civil Rights and Constitutional Rights**</u>

20

21        U.S.C.§ 1986 expands the available defendants beyond the circle of conspirators.

22 Moreover, all corporations for profit, partnerships and voluntary associations are also subject to

23 claims (See, *Bethel v. Jendoco Construction Corp.,* 570 F.2d 1168 (3rd Cir. 1978); *Vietnamese*

24 *Fishermen's Ass'n. v. Knights of the Ku Klux Klan,* 518F. Supp. 993 (S.D. Tex. 1981).

1    U.S.C.§ 1986: Affirmative duty to prevent, imposes a "Good Samaritan" duty to protect
2    upon others who have knowledge of impending execution of a racial conspiracy as defined by
3    §1985 of the Act of and have the ability to prevent the conspirators from carrying out their
4    objectives. Knowledge of the §1985 conspiracy, power to protect its victims, and neglect or refusal
5    to protect results in liability under §1986. In fact, §1986 reaches more broadly than §1985, its
6    predicate, by inculpating bystander defendants who are not themselves conspirators under §1985.

7    Thus, §1986 is unique among American Civil Rights Statutes in creating liability when a
8    defendant has neither personally committed a discriminatory act, engaged in a conspiracy to do
9    so, nor acted with discriminatory intent. **A negligent failure to protect its victims is actionable**
10   (See, *Clark v. Clabaugh*, 20F.3d 1290, 1298 (3rd Cir. 1994) (*finding that negligence is sufficient*
11   *to maintain §1986 claim*).

12   The statute creates a legal duty. In effect, it "deputizes" local actors in a position to
13   intervene in prohibited conspiracies and renders them liable to victims of conspiratorial violence,
14   thus focusing on those in the best position to stop the violence. As a result, §1986 extends the
15   reach of §1985, which attaches liability only to those who affirmatively enter into conspiracy.

16   The statute's duty to protect is instrumental in confronting a particularly serious evil- racist
17   conspiracies- that cannot be adequately addressed by other means. The harm of racism remains
18   serious. Racist conspiracies and other hate crimes continue to be committed, demonstrating the
19   ongoing need for the remedies of §1986.

20   *Although our current circumstances of racial rivalry, discontent and social alienation are*
21   *generally less egregious and blatant than those during Reconstruction, the remedies of §1986 are*
22   *still needed. The persistence of racial hatred and discrimination, as documented by hate crime*

4

1   *statistics, confirms that ongoing need. Section 1986 is thus a vital, but underused weapon in the*

2   *battle against racist conspiracies.*

3       Section 1986 has significance beyond its immediate applications, as it sheds light on the

4   proper reach of the Fourteenth Amendment to the Constitution which reads as follows:

5       Section I:  *All persons born or naturalized in the United States, and subject to the jurisdiction*

6       *thereof, are citizens of the United States and of the State wherein they reside.  No State shall make*

7       *or enforce any law which shall abridge the privileges or immunities of citizens or the United States,*

8       *nor shall any State deprive any person within its jurisdiction the equal protection of the laws…*

9

10       The Reconstruction-era Congress construed the scope of Section 1986 enforcement powers

11   very broadly.  The government is required not only to treat citizens equally, but to accord them

12   protection from threats of private violence and other private violations of law that undermine

13   equality.

14       A failure to provide equal protection can arise as easily from inaction as from action: a

15   failure to rescue or protect an aggrieved citizen from racist violence can also constitute a failure to

16   provide equal protection.

17       **According to scholars, the Equal Protection Clause is also an affirmative obligation**

18   **to ensure that citizens are protected from private violence, denial of the right to contract,**

19   **and the like, that would deny them their status as free, equal persons.**

20       ***A more affirmative interpretation of the Equal Protection Clause suggests a broader and***

21       ***more effective remedy, <u>which would focus primarily on the need to protect victims of</u>***

22       ***<u>discrimination who have been denied the ability to earn a livelihood</u>.*** *(emphasis added).*

23

1       Moreover, Section 1986 requires that protection be provided by those able to assist victims

2    of racist conspiracies regardless of their status as causal agents or their individual intent.  In order

3    to provide effective protection for aggrieved victims those outside the immediate circle of direct

4    causation may be drawn into corrective actions.  Without such affirmative protection, victim would

5    not receive protection equivalent to that afforded the relatively more privileged, who remain free

6    from such violent intrusions into their lives.

7    ----------------------------------------------------------------------------------------------------

8

9    **I.1. <u>42 U.S.C. § 1985: CAUSE OF ACTION ARGUMENTS</u>**

10    **CONTINUING RACE AND CLASS BASED CONSPIRATORAL COLLUSION AND**
11    **COERCION FROM 2004 THROUGH 2020 IN COLLUSION WITH YALE**
12    **UNIVERISTY SCHOOL OF MEDICINE**
13    ***AND***
14    **FAILURE TO PREVENT THE ONGOING COERCIVE AND/OR VINDICTIVE**
15    **RETALIATORY EMPLOYMENT DISCRIMINATION**

16       The ***initiation*** of the race and class-based conspiracy and coercion in collusion with Yale

17    University School of Medicine (YSM), namely, Dr. Richard Lifton (*former Chairman, Genetics*

18    *Department, Yale School of Medicine (YSM); currently an Adjunct Professor at the Genetics*

19    *Department: **Exhibit 1***) in collusion with defendant, Dr. Cynthia Morton (*Director of Clinical*

20    *Cytogenetics Laboratory, Brigham and Women's Hospital, Harvard Medical School: **Exhibit 2***)

21    during 2003-04 period, and consequently, ***"as a continuing domino-effect"***- has permanently

22    arrested <u>*from 2004 until now*</u> Dr. Rafi's (*plaintiff*) in-demand and highly paid professional clinical

23    cytogenetics career job opportunities not only at Harvard affiliated BWH to this day, but also

24    around the nation (***Exhibits 2,3,4,5***), thus rendering him as a "*pariah*" in his specialized clinical

25    cytogenetics and medical genetics community around the nation, and consequently, he is a

26    victimized "*pauper*" today.

1        In this alleged race and class based conspiratorial collusion with Dr. Richard Lifton at Yale

2     School of Medicine (given Dr. Lifton's prior faculty position at HMS prior to his assuming the

3     Chairmanship of the Genetics Department at YSM (*Exhibits 1, 14*)), defendant, Dr. Cynthia

4     Morton "**initiated and perpetuated coercive and intentional discriminatory retaliation**

5     **against plaintiff's each and every professional clinical cytogenetics,  medical genetics**

6     **research and training opportunities** at Dr. Morton's diagnostic clinical cytogenetics laboratory

7     at BWH (HMS) from 2004 through 2020 along with dozens of medical genetics research and

8     training positions at other BWH laboratories from 2004 through 2020, totaling several dozen job

9     applications (*Exhibits 2,4*) in collusion with Dr. Richard Maas *(Chief of Genetics, BWH)* and

10    others at BWH/HMS, and also in collusion with Dr. Mira Irons *(Associate Professor of Pediatrics*

11    *and medical genetics at the Harvard Medical School affiliated Children's Hospital Boston*

12    *(CHB/HMS))* and Dr. Barbara Pober *(former YSM faculty member who had assumed a tentative*

13    *faculty position along with Dr. Mira Irons at CHB/HMS).*

14       Defendants, Dr. Morton, Dr. Maas, Dr. Irons and Dr. MacDonald – in conspiratorial

15    collusion with Dr. Lifton (Yale School of Medicine and Yale University) and on behalf of Dr.

16    Barbara Pober initiated the alleged race, religion and class- based conspiratorial collusion and

17    coercion at BWH/HMS, which led to the continuing ruthless coercion and vindictive retaliation

18    against plaintiff's more than five dozen job opportunities at various levels, not excluding his

19    professional clinical cytogenetics, medical genetics research and training opportunities and

20    laboratory position at Harvard Medical School affiliated academic, research and training hospitals

21    BWH, MGH and CHB from 2004 through 2020 *(Exhibits 2, 4, 8, 9, 13, 22, 23).*

22       This callous and inhumane continuing race and class- based violations have gravely

23    deprived not only plaintiff's civil and constitutional rights as a naturalized citizen during this

1   prolonged period, but it has also deprived him of his professional career and livelihood- <u>rendering</u>

2   <u>him as a *"pauper"* today</u>.   <u>These continuing blatant violations are indeed actionable under 42</u>

3   <u>U.S.C. § 1985</u>.

4       It should be noted that this lawsuit alleges on-going violations as of 2020 and the

5   consequent worsening of the conditions due to the alleged race and class based conspiratorial

6   collusion and on-going coercive and vindictive reprisals and due to the *"continuing domino effect"*

7   of defendants' initial coercive employment reprisals at Harvard affiliated BWH, MGH and CHB-

8   has now resulted in the permanent loss of his high-paying and in-demand professional career and

9   consequently, it has irreversibly damaged his personal life and psyche due to deprivation of

10  income, rendering him in a financially dire situation today, as the evidencing in this litigation

11  shows.

12      Therefore, these still on-going violations are NOW unquestionably and appropriately

13  actionable under 42 U.S.C. § 1985(3), vis-à-vis under § 1986, against all defendants and co-

14  conspirators, as 42 U.S.C. § 1985 provides for joint and several liability for members of the

15  conspiracy and moreover, each member of the conspiracy is jointly and severally liable for the acts

16  of his or her co-conspirators.

17  _____

18  ## II. 1. <u>42 U.S.C § 1986: CAUSE OF ACTION ARGUMENTS</u>

19  **THE ALLEGED FAILURE TO HALT AND PREVENT THE CONTINUING RACE AND**

20  **CLASS-BASED CONSPIRATORIAL COERCIVE TO INTERFERENE WITH**

21  **PLAINTIFF'S CIVIL RIGHTS AND CONSTITUTIONAL RIGHTS IS ADDITIONALLY**

22  **ACTIONABLE UNDER 42 U.S.C § 1986**

23      It should be noted that Dr. Barbara Pober, Dr. Allen Bale, Dr. Richard Lifton and Dr.

24  Cynthia Morton are all not only widely interconnected leading researchers and influential national

1    leaders in the broader field of Dr. Rafi's medical genetics profession, and more importantly, they

2    are all also highly influential at the American Board of Medical Genetics (ABMGG)- a national

3    organization which brings together annually medical genetics professionals from around the nation

4    through its annual American Society of Human Genetics meetings and the ABMGG is also

5    empowered  to re-certify their professional medical genetics credentials periodically.

6         Therefore, prospective employers around the nation (1) who came to know about the

7    alleged on-going racial conspiracy against Dr. Rafi involving highly influential and powerful

8    group of Jewish and/or leading medical geneticists at HMS (Dr. Martin, Dr. Irons, and Dr. Pober)

9    and at YSM (Dr. Richard Lifton and Dr. Bale) by noticing an abrupt and most unusual ending *(as*

10   *is evidenced in plaintiff's professional biodata and resume!)* of his high-paying professional

11   clinical cytogenetic career *(Exhibit 3)* ever since his successful completion of the professional

12   ABMGG clinical cytogenetics training at Yale during 2004; and (2) given the fact that plaintiff's

13   professional clinical cytogenetics specialty is in great demand around the nation and highly paid

14   as well *(Exhibit 3)*, were also coerced into not considering plaintiff's professional clinical

15   cytogenetics, medical genetics research and molecular genetics training opportunities to this day.

16   Consequently, plaintiff is a *pauper* today.

17        Due to this deprived situation, plaintiff feels like a slave- who has been so callously denied

18   of his civil rights and constitutional rights for such a long period of time, and deprivation of his

19   professional livelihood since 2004- as a grave punishment for exercising his constitutionally

20   guaranteed liberties to move and choose as a citizen under the Fourteenth Amendment's

21   provisions.

22        The alleged defensive race and class-based conspiracy plan was initiated by Dr. Lifton on

23   behalf of Yale University, which was ruthlessly and ceaselessly executed by the defendants, Dr.

1    Morton, Dr. Irons, Dr. Maas, and Dr. MacDonald at Harvard Medical School, which was

2    additionally augmented by Dr. Pober from within Harvard Medical School- as a safeguard against

3    a potential racial discrimination, retaliation and First Amendment- Constitutional violation- law

4    suit by a disgruntled *Arab-Palestinian minority faculty member, namely, Dr. Mazin Qumsiyeh.*

5    Yale University's stealth-defensive plan to utilize Dr. Rafi (plaintiff) as witness against Dr.

6    Qumsiyeh and to facilitate rehiring of Dr. Barbara Pober, while denying Dr. Qumsiyeh a *prima*

7    *facie case of retaliation, racial discrimination and First Amendment right to free speech violation,*

8    for stealthily and abruptly terminating his faculty position by Dr. Lifton on behalf of Yale

9    University.

10   This in-turn caused YSM / Dr. Lifton to conspire with Dr. Morton at HMS and with Dr.

11   Pober at YSM (*majority white race upper class females, Christian & Jewish, respectively*) to

12   perpetuate the reckless and ceaseless intentional retaliatory discrimination against Dr. Rafi's

13   (*minority- Asian of East Indian heritage and of minority Islamic faith*) dozens of professional

14   clinical cytogenetics job applications at BWH and other Harvard affiliated  hospitals, as well as

15   around the nation to this day *(Exhibits 2,4,5)* recklessly violating plaintiff's Civil Rights and the

16   Constitutional provisions as a naturalized citizen, particularly under the Fourteenth Amendment's

17   provisions of  life, liberty, and the pursuit of happiness.

18   Due to this untenable tug-of-war situation (*Exhibit 12*) while Dr. Rafi was in Boston after

19   the successful completion of his professional clinical cytogenetics ABMGG training at YSM

20   during 2004, he assumed during 2004 a minimally paying non-professional basic genetics research

21   position at a laboratory at the Children's Hospital Boston (CHB, HMS), but due to the alleged

22   continuing conspiratorial collusion and coercion, Dr. Rafi's was stealthily terminated from this

23   research position during 2005.

1        Then during 2006 Dr. Rafi again out of desperation, managed to get yet another minimally

2    paying non-professional technologist and laboratory managerial position at a federal government

3    funded [GCRC/CTSA] entity within CHB (HMS) and again, due to the alleged continuing

4    conspiratorial collusion and coercion, Dr. Rafi was stealthily terminated from this position as well

5    during the year 2010.

6        During 2004 through 2020, Dr. Morton and other medical geneticists at HMS refused to

7    consider more than 3 dozen professional clinical cytogenetics and related technological positions,

8    medical genetics research, molecular genetics training and molecular genetics diagnostic service

9    related job applications *(Exhibits 2, 4, 8, 9, 13, 22, 23)*.

10

11                    *"EVER-LASTING DOMINO-EFFECTS"*

12        *As a "continuing domino-effect",* the alleged ceaseless race and class based conspiratorial

13    collusion, and coercive and/or vindictive *vetoing* of plaintiff Dr. Rafi's  professional clinical

14    cytogenetics and related medical genetics research and training at HMS affiliated hospitals and

15    medical centers to this day by defendant has arrested plaintiff's in-demand and highly paid

16    professional as well as medical genetics careers *(Exhibit 3)* rendering plaintiff as a *"pariah"* in

17    his specialized medical genetics and clinical cytogenetics field and consequently, plaintiff is a

18    *"pauper"* today.

19        This suit alleges on-going violations as of 2020 and worsening of the conditions due to the

20    alleged race and class based conspiratorial collusion and on-going coercive and vindictive reprisals

21    and due to the *"continuing domino effect"* of defendant Dr. Morton's (BWH/HMS) initial coercive

22    employment reprisals at Harvard affiliated BWH, MGH and CHB.  Again, it should be noted that

1    these later and latest (until 2020) continuing alleged violations were not ripe for judicial review

2    during 2014/2015 period.

3            Consequent to Dr. Morton's race and class based illegal conspiratorial collusion with Dr.

4    Lifton YSM) and Dr. Bale (YSM) and her continuing failure to cease or prevent the alleged

5    conspiratorial collusion and coercive employment reprisals, despite plaintiff's repeated pleas to

6    defendant Dr. Morton not to do so (***Exhibits 11, 13***) is additionally actionable under 42 U.S.C. §

7    1986.

8    -------------------------------------------------------------------------------------------

9                           **PARTIES**

10                           **Plaintiff**

11        *42 U.S.C. § 1985 provides a claim to anyone injured in their person or property or deprived*

12    *of any right or privilege of national citizenship, by a conspiracy prohibited by one of § 1985's six*

13    *clauses.  Thus, a plaintiff need not be target of the conspiracy or a member of the class which is*

14    *the object of the*

15    *Defendants' discrimination or animus (See, Griffin v. Breckenridge, 403 U.S. at 103 (injured*

16    *plaintiff need not be the target of the conspiracy); Cantis v. San Joaquin Sheriff's Posse Comitatus,*

17    *641 F.2d 711, 720-21 (9th Cir.) ("the plaintiff must be a member of the class discriminated against*

18    *to claim the benefits of § 1985(3)"). Cert. denied. 454 U.S. 967 (1981)).  Natural persons,*

19    *corporations for profit or not for profit, partnerships, and voluntary associations may sue (See,*

20    *N.A.A.C.P. v. Detroit Police Officer's Ass'n. 525 F. Supp.1315, 1321-23 (E.D. Va. 1979).*

21         **Plaintiff, Dr. Syed Rafi** is a naturalized United States citizen for more than three decades,

22    *Colored -Asian of East Indian- non-Caucasian- minority race and class and of minority Islamic /*

23    *Muslim faith*.  Plaintiff currently resides in <u>Falls Church, in the State of Virginia.</u>  Plaintiff

24    completed his post-doctoral professional American Board of Medical Genetics (ABMG)- Clinical

1    Cytogenetics training during 2001-2003 period at Yale School of Medicine (New Haven, CT) at

2    the Department of Genetics under the chairmanship of **Dr. Lifton** *(Exhibit 1)*, under Dr. Allen

3    Bale's   *(Exhibit 6)* directorship of the ABMG- training program at the clinical cytogenetics

4    laboratory which was in turn directed by   **Dr. Mazin Qumsiyeh** (*Palestinian Arab- Middle*

5    *Eastern- brown complexioned- non-Caucasian minority race and class)* whose associate professor

6    faculty position was abruptly terminated by Yale University due to his virulent anti-Israel pro-

7    Palestinian activism *(Exhibit 7)*.

8                                                                    **Defendants**

9          *42 U.S.C. § 1985 provides for joint and several liability for members of the conspiracy.*

10   *All corporations not for profit as well as for profit, partnerships- are subject to claims (See, Bethel*

11   *v. Jendoco Constr. Corp., 570 F 2d. 1168 (3ʳᵈ Cir. 1978) (corporation and labor union);*

12   *Vietnamese Fishermen's Ass'n v. Knights of the Ku Klux Klan, 518 F. Supp. 993 (S.D.Tex. 1981*

13   *(voluntary association).*

14         *It should be noted that under 42 U.S.C. §1986- bystander liability expands the available*

15   *defendants beyond the circle of conspirators:*

16         *Every person who, having knowledge that any of the wrongs conspired to be done, and*

17         *mentioned in Section 1985 of this title, are about to be committed, and having power to*

18         *prevent or aid in preventing the commission of the same, neglects or refuses so to do.  If*

19         *such wrongful act be committed, shall be liable   to the party injured, or his legal*

20         *representatives, for all damages caused by such wrongful act, which such a person by*

21         *reasonable diligence could have prevented; and such damages may be recovered in an*

22         *action on the case; and any number of persons guilty of such wrongful  neglect or refusal*

23         *may be joined as defendants in the action; ....*

1    **Defendant, Harvard University School of Medicine** (HMS) is situated in Boston, MA,

2    and it is an integral part of **Harvard University**-which is situated in Cambridge, MA. It is an Ivy

3    League institution. **Brigham and Women's Hospital, Children's Hospital Boston,**

4    **Massachusetts General Hospital, Dana Farber Cancer Hospital, and Beth Israel Deaconess**

5    **Medical Center**- where Dr. Rafi's (plaintiff) more than four dozen professional and non-

6    professional job applications were continuously subjected to coercive and retaliatory

7    discrimination exclusively in the race and class based conspiratorial collusion with Dr. Bale and

8    Dr. Lifton at Yale School of Medicine- are all primary clinical, teaching and research centers of

9    Harvard Medical School. Moreover, Dr. Morton, Dr. Maas, Dr. Irons, and Dr. MacDonald are

10   tenured professors of Harvard University, while Dr. Pober also was serving as an associate

11   professor of Harvard.   Most of the alleged conspiratorial and coercive retaliatory and

12   discriminatory violations against Dr. Rafi's more than four dozen professional and non-

13   professional candidacies were based on the research and training grants that were awarded to

14   Harvard University by the National Institutes of Health as Federal grants, which were utilized at

15   the Harvard affiliated hospitals and medical centers.

16        It should be noted that Harvard University as a whole and its other medical faculty

17   member at its Medical School of Medicine have also been accused of numerous other racial and

18   ethics violations (like that of Yale University) as partially compiled below:

19        Government accuses Harvard of 'outright racial balancing'

20        www.washingtontimes.com/

21        The Washington Times Hard Hitting News and Fearless Journalism for Over 35 Years. National.

22        Late Breaking. Trusted Source. Local. Types: World News, Political news, Sports, Opinion.

23        Racial Discrimination at Harvard and America's "Elite" Universities ...

24        https://www.heritage.org › civil-society › commentary › racial-discriminati...

1    Aug 31, 2018 - **Harvard University** uses a **racial** quota system in its admissions process.

2    ... **violating** the Civil Rights Act of 1964 and has imposed a **racial** quota system, ... of the **class**

3    **based** on academics alone, and their share would be 31.4 ...

4    'Powerful evidence': Legal foes renew charges of racial bias in ...

5    https://www.washingtonpost.com › news › grade-point › 2018/07/30 › powe...

6    Jul 30, 2018 - The plaintiff alleges that the elite university discriminates against ... in college

7    admissions Monday rejected **Harvard University's** argument ... university is **violating** Supreme

8    Court guidance on the use of **race** in choosing a freshman **class**. Students for Fair

9    Admissions, **based** in Arlington, Va., asserted in a ...

10   'The wolf of racial bias': the admissions lawsuit rocking Harvard ...

11   https://www.theguardian.com › education › oct › harvard-affirmative-actio...

12   Oct 18, 2018 - **Harvard** flatly denies that its admissions process involves **discrimination** or

13   quotas on **racial** groups. The **university** says that **race** is just one of a ...

14   At Trial, Harvard's Asian Problem and a Preference for White Students ...

15   https://www.newyorker.com › news › our-columnists › at-trial-harvards-asia...

16   Oct 23, 2018 - In the nineteen-twenties, the concept of **diversity** in admissions ...

17   that Harvardallows implicit **racial bias** and stereotypes to infect the process.

18   Harvard admissions trial opens with university accused of bias against ...

19   https://www.washingtonpost.com › education › 2018/10/15 › harvard-admis...

20   Oct 15, 2018 - BOSTON — Accusations that the Harvard University admissions process is ...

21   "That's race discrimination, plain and simple," Hughes said.

22

23   **Defendants, Brigham and Women's Hospital & Children's Hospital Boston-** are

24   independent leading teaching and research hospitals although they are affiliated with Harvard

25   Medical School as academic and research centers- where Dr. Rafi's (plaintiff) more than three

26   dozen professional and non-professional job applications were continuously subjected to coercive

27   and retaliatory discrimination in collusion with Dr. Bale and Dr. Lifton at Yale School of

28   Medicine-.

15

1      Moreover, Dr. Morton, Dr. Maas, Dr. Irons, Dr. MacDonald are serving these hospitals

2      while holding their tenured professorships of Harvard University.  Dr. Pober also was tentatively

3      serving as an associate professor of HMS at Children's Hospital Boston.

4      **Defendant, Dr. Cynthia Morton** *(Majority Caucasian- White race and class; majority*

5      *Christian faith*) **at Brigham and Women's Hospital, Harvard Medical School**.  Dr. Morton is

6      a nationally well-known and tenured medical genetics professor at Harvard Medical School and

7      director of the ever-expanding clinical cytogenetics laboratory at BWH (HMS) and <u>like Dr. Bale,</u>

8      she has served as the ABMGG medical genetics training program director and NIH training funds

9      recipient for the ABMGG program at HMS from at least the year 2000.  *Dr. Morton belongs to*

10     *the same race and class as Dr. Lifton and Dr. Bale.* Dr. Morton is also the former colleague of Dr.

11     Lifton at BWH/HMS prior to Dr. Lifton assuming the chairmanship of the Genetics Department

12     at YSM *(Exhibits 1, 2, 4, 11)*.

13     **Defendant, Dr. Richard Maas** *(majority Caucasian-white race and class, majority*

14     *Christian faith)* - Professor of Genetics at **Brigham and Women's Hospital, Harvard Medical**

15     **School**. BWH conspired with Dr. Lifton, Chairman, Genetics Department, YSM and with Dr.

16     Morton, Professor of Pathology and Director of Clinical Cytogenetics BWH (HMS) to deny

17     consideration of Dr. Rafi's (plaintiff) series of medical genetics research job applications at his

18     laboratory, **as is evidenced in *Exhibit 13*,** in collusion with defendants, Dr. Morton, Dr. Maas, Dr.

19     Irons, and Dr. MacDonald at Brigham and Women's Hospital and Children's Hospital Boston, and

20     Massachusetts General Hospital, respectively, and in collusion with Dr. Lifton and Dr. Bale at

21     Yale School of Medicine.

22     **Defendant, Dr. Mira Irons** *(Caucasian- White- majority race and privileged class of*

23     *Ashkenazi Jew (<u>same as Dr. Barbara Pober</u>))* is an influential medical genetics professor at

1    **Children's Hospital Boston, Harvard Medical School.**  Being the supervisor, colleague and

2    well-wisher of Dr. Pober at CHB, Dr. Irons abrasively and negatively influenced Dr. Morton to

3    prevent her from considering plaintiff's several dozen professional as well as research job

4    applications over the years at Dr. Morton's ever expanding clinical cytogenetics laboratory at

5    BWH/HMS in order to facilitate the return of Dr. Pober along with plaintiff, per the alleged

6    conspired plan by YSM.

7            Given Dr. Iron's official capacity as well as personal capacity- *"proactive and out-going"*

8    role in perpetuating the alleged conspiratorial collusion and coercion- at Harvard Medical School

9    as a whole on behalf of her colleague Dr. Pober at Children's Hospital Boston e is being sued in

10   her official and personal capacities.

11           **Defendant, Dr. Marcy MacDonald** *(Majority Caucasian- White race and class; majority*

12   *Christian faith)* is senior tenured full professor at Massachusetts General Hospital which is also an

13   integral part of Harvard Medical School.  Like Dr. Morton at Brigham and Women's Hospital

14   (HMS), Dr. MacDonald had several Federal research grants, and she initially expressed her interest

15   in offering a molecular genetics research position to Dr. Rafi via email (**which will be evidenced**

16   **during trial**) soon after plaintiff's completion of the YSM-ABMG-professional medical genetics

17   training.  Exclusively due to the alleged conspiratorial collusion and coercion by Yale and given

18   the fact that Dr. Pober herself secured a tentative clinical research position at Dr. MacDonald's

19   laboratory during the interim period, understandably due to Dr. Pober's additional influence

20   peddling, Dr. MacDonald chose to withdraw her in interest in plaintiff's candidacy, as the email

21   evidencing would show.

22

23

1                                ***ADDITIONAL CONSPIRATORS***

2            AT HARVARD MEDICAL SCHOOL AFFILIATED HOSPITALS AND MEDICAL CENTERS

3

4          **Co-conspirator, Dr. Barbara Pober** (*Caucasian- White- majority race and Jewish-*

5     *privileged class; female-Jewish faith (same as Dr. Mira Irons and others: **Exhibit 15**)* is the former

6     Associate Professor of Pediatrics and medical geneticist at YSM at the Department of Genetics

7     under the chairmanship of Dr. Lifton, where Dr. Bale is continuing to serve as a faculty member

8     from 2000 to this day. Dr. Pober was tentatively serving at CHB/HMS *(Exhibit 15)* and desperately

9     wanting to return to YSM given the creation of an open professor's position for her *(Exhibit 17)*

10    by Dr. Lifton (YSM) at his Department of Genetics, per the alleged stealth plan.  It should also be

11    noted that Dr. Pober's husband is an influential tenured professor, director and vice-chair at YSM.

12    Both the Pobers are said to be upper class and highly privileged-majority Caucasian-Ashkenazi-

13    race and Jewish professors and thus, bringing constant pressure on Dr. Lifton to rehire Dr. Barbara

14    Pober at YSM per their agreed upon stealth plan to do so after abruptly and deceptively terminating

15    **Dr. Mazin Qumsiyeh's** *(Palestinian Arab- Middle Eastern- Colored - non-Caucasian  minority*

16    *race and class; male)* associate professor position due to Dr. Qumsiyeh's virulent pro-Palestinian

17    and anti-Israeli political activism at Yale *(Exhibit 7)*.

18          Dr. Pober while serving at Harvard Medical School at the Children's Hospital Boston, in

19    collusion with her well-wisher senior colleague, Dr. Mira Iron was additionally instrumental in

20    coercing Dr. Morton *(defendant)*  to deny consideration of Dr. Rafi's *(plaintiff)* numerous

21    professional clinical cytogenetics and related technological job applications at Dr. Morton's

22    clinical cytogenetics laboratory at BWH/HMS.  As alleged, Dr. Bale (YSM) along with Dr. Lifton

23    (YSM) also directly conspired with Dr. Morton to deny any consideration of Dr. Rafi's numerous

24    professional job applications at Dr. Morton's clinical cytogenetics laboratory *(Exhibits 2,4)*.

1    These alleged conspiratorial ceaseless denials of professional job opportunities was to coerce Dr.

2    Rafi to take up a position at YSM <u>instead</u> to facilitate the return of Dr. Pober back to YSM, utilizing

3    Dr. Rafi as a defensive witness against the disgruntled former YSM professor, **Dr. Mazin**

4    **Qumsiyeh** (*Palestinian Arab- Middle Eastern- brown complexioned- non-Caucasian minority*

5    *race and class; male* ), whose position was deceptively terminated by YSM due to Dr. Qumsiyeh's

6    virulent pro-Palestinian and anti-Israeli political activism at Yale *(Exhibit 7)*.

7         Dr. Rafi's intense desire to live in the vibrant city of Boston where he felt very much at

8    home given his Asian Indian heritage, the enticing academic and research atmosphere at Harvard

9    Medical School (*Exhibits 11, 8)* and his desire <u>not to</u> become a witness against Dr. Qumsiyeh in

10   the tug of war between Yale and Dr. Qumsiyeh (as has been emphasized in Dr. Rafi's confidential

11   memos to  Dr. Bale (*ABMGG program director, Genetics Department, YSM; Exhibit 10)* and to

12   Dr. Lifton (*Chairman, Genetics Department, YSM; Exhibit 16)*- all cumulatively led to his refusal

13   to take up Dr. Qumsiyeh's vacated faculty position (*which was conveyed to Dr. Rafi by Dr.*

14   *Fredrich Bieber (Co-Director at Dr. Morton's clinical cytogenetics laboratory at BWH, HMS*).

15        However, empathizing with the plight of Dr. Pober, when plaintiff twice sincerely offered

16   to take up a research position instead at YSM to facilitate the return of Dr. Pober to YSM (*where*

17   *her husband serves as a tenured (Bayer) Professor of Translational Medicine; Director, Human*

18   *and Translational Immunology Program; and as Vice-Chair, Dept. of Immunobiology for the*

19   *Section of Human and Translational Immunology*), his sincere overtures did not yield any positive

20   response from Dr. Lifton.

21                    **ADDITIONAL NATION-WIDE CO-CONSPIRATORS**

22        Nation-wide professional clinical cytogenetics, medical genetics research and training

23   opportunities were also denied to this day <u>due to</u> the *domino-effect* of the alleged initial race  and

1  class- based conspiratorial coercion by Dr. Morton at Brigham and Women's Hospital (BWH),

2  Harvard University Medical School (HMS) during 2004 that was initiated and perpetuated by Dr.

3  Morton in collusion with Dr. Lifton, Dr. Bale, Dr. Pober and Dr. Irons- soon after Dr. Rafi's

4  completion of his professional clinical cytogenetics ABMGG training at YSM during 2003-04

5  period.

6         Moreover, Dr. Bale and Dr. Lifton at YSM continued to negatively interfere as "*third*

7  *parties*" in the following professional clinical genetics job and medical genetics training

8  opportunities at Harvard as well as around the nation to this day *(Exhibits 2,4,5,7-10,13,14,22,23)*,

9  when they were contacted by prospective employers from around the nation to verify Dr. Rafi's

10  clinical cytogenetics training at Yale and to verify the reason for the unusual cessation in his

11  professional clinical cytogenetics career since accomplishing his ABMGG professional training at

12  Yale during 2004.

| NATION-WIDE ALLEGEDLY *CO-CONSPIRING* INSTITUTIONS: | DURATION: |
|---|---|
| (also see *Exhibits 2, 4, 5, 22, 23*) | |
| *Bold font: Recognized as Co-Conspirators:* | |
| 1.  **Brigham and Women's Hospital and other Harvard-affiliated Hospitals and Medical Centers, Boston, MA.** | **2004-2020** |
| 2.  **Boston University Medical Center, Boston, MA.** | **2013-14** |
| 3.  **Tuft's University Medical Center, Boston, MA.** | **2013-15** |
| 4.  **Children's Mercy Hospital, University of Missouri, Kansas City, MO. Cytogenetics Division and ABMGG- training program.** | **2014-20** |
| 5.  **Quest Diagnostics, Capistrano, CA, Chantilly, VA, and other locations** | **2014-20** |
| 6.  Neo-Genomics, Inc., Fort Myers, FL. | **2019** |
| 7.  New York Genome Center, New York, NY. | 2014-19 |
| 8.  Ambry Genetics, Aliso Viejo, CA. | **2019** |
| 9.  Eurofins Laboratoires, Louisville, KY. | **2019** |
| 10. Irvine Scientific, Santa Ana, CA. | **2019** |
| 11. **National Institutes of Health (NIH), Bethesda, MD.** | **2017-19** |
| 12. **University of Kansas Medical Center, Kansas City, MO. Cytogenetics, Dept. of Pathology** | **2014-17** |

| | | |
|---|---|---|
| 13. | Gene DX, Gaithersburg, MD. | **2017** |
| 14. | Indiana University, Dept. of Medical & Molecular Genetics, Indianapolis, IN. | **2014-16** |
| 15. | Oregon Health & Science University, Dept. of Medical & Molecular Genetics, Portland, OR. | **2014-16** |
| 16. | Clinical Cytogenetics Laboratory & ABMGG- Medical Genetics Program Columbia University, New York, NY. | **2014-16** |
| 17. | Children's Hospital of Pennsylvania, University of Pennsylvania, PA. Division of Medical Genetics & ABMGG- Medical Genetics Program, | **2014-16** |
| 18. | Cytogenetics & Molecular Genetics Division, University of Minnesota, MN. | 2015-16 |
| 19. | Medical Genetics Division, Baylor College of Medicine, Houston, TX. | 2014-15 |
| 20. | Cincinnati Children's Hospital, Cincinnati, OH. | 2014-15 |
| 21. | Medical Genetics Division, University of California, San Diego, CA. | 2014-15 |
| 22. | Cytogenetics and ABMGG program, Montefiore Medical Center, Albert Einstein College of Medicine, New York, NY. | **2015** |
| 23. | New York Presbyterian / Weill- Cornell University Medical Center, NY. Cytogenetics, Department of Pathology. | **2014-15** |
| 24. | The Jackson Laboratory, Farmington, CT. | **2015** |
| 25. | Sloan Memorial Kettering Institute, New York, NY. | **2014** |
| 26. | Mayo Clinic, Rochester, MN. | **2014-15** |
| 27. | Greenwood Genetics Center, SC. | **2014** |
| 28. | University of Pittsburg Medical Center, Pittsburg, PA. | **2014** |
| 29. | The University of Nebraska Medical Center, Omaha, NE. | 2015 |
| 30. | University of California, San Francisco, CA. | 2015 |
| 31. | University of Miami, Medical Genetics Division, Miami, FL. | 2014 |
| 32. | University of Wisconsin, Madison, WI. | 2014 |
| 33. | University of Washington, Seattle, WA. | 2014 |
| 34. | Virginia Commonwealth University, Richmond, VA. | 2014 |
| 35. | University of Texas-South Western Medical Center, Dallas, TX. | 2014 |
| 36. | University Hospital-Cleveland Medical Center, OH. | 2014 |
| 37. | Rutgers New Jersey Medical School, Newark, NJ. | 2014 |
| 38. | Tulane University Medical Center, New Orleans, LA. | 2014 |
| 39. | University of Michigan, Dearborn, MI. | 2014 |
| 40. | Henry Ford Health System, Detroit, MI. | 2014 |
| 41. | University of Iowa Hospital & Clinics, Iowa City, IA. | 2014 |

| | | |
|---|---|---|
| 1 | 42. Emory University Medical Center, Atlanta, GA. | 2014 |
| 2 | **43. Stanford University Medical Center, Stanford, CA.** | **2014** |
| 3 | 44. Children's Hospital, Colorado, Aurora, CO. | 2014 |
| 4 | **45. University of Maryland, College of Medicine, Baltimore, Maryland.** | **2014** |
| 5 | **46. Mount Sinai School of Medicine, New York, NY.** | **2013** |

6      -------------------------------------------------------------------------------------------

7                                                    **JURISDICTION**

8          42 U.S.C.§§ 1985 and 1986 cases may be filed in State Courts of general jurisdiction (See,

9   *Bennun v. Board of Governors,* 413F. Supp. 1274, 1279 (D.N.J.1976); *Vasan v. Carrane*, 31 Conn.

10  Supp. 338, 330 A. 2d 98 (1974)).  In determining whether State Courts can entertain jurisdiction

11  over federally created cause of action, the Supreme Court has applied a presumption of

12  concurrency (See, generally, *Martin H. Redish & John Muench, Adjudication of Federal Causes*

13  *of Action in State Court, 75 Mich. L. Rev. 311 (1976).*

14         State Courts may exercise jurisdiction over federally created causes of action, as long as

15  Congress has not explicitly or implicitly made federal court jurisdiction exclusive (See, *Yellow*

16  *Freight System, Inc. v. Donnelly,* 494 U.S. 820 (1990)).

17         In accordance with the long-standing with the long-standing dual sovereignty doctrine that

18  State and Federal governments are separate sovereigns and hold independent power to define and

19  punish offenses for the identical conduct (See, *Gamble v. United States*, No. 17 – 646. Decided

20  June 17, 2019), this State of Massachusetts Superior Court certainly has jurisdiction over these

21  federally created causes of action.

22                                                       **VENUE**

23         Proper venue for §§ 1985, 1986 claims lies <u>in any district where an overt act in furtherance</u>

24  <u>of the conspiracy occurred  (28 U.S.C. § 1391(b) (1976); *Jones v. Bales,* 58 F.R.D. 453,</u>

1   458(N.D.Ga.1972) *(for venue purposes § 1985 actions parallel criminal conspiracy prosecutions)*;

2   *aff'd*, 480 F.2d 805 (5th Cir. 1973).

3   Since the alleged race and class based illegal conspiracy's furtherance occurred at Harvard

4   Medical School affiliated Brigham and Women's  Hospital (BWH) in collusion with defendant

5   Dr. Morton- as the conspiratorial collusion, coercion and ruthless and ceaseless retaliatory

6   employment discrimination which continues to this day at BWH *(Exhibits 2, 4, 8, 9, 13, 22, 23),*

7   since 2003, and consequently, *"as a continuing domino-effect"*- has effectively and permanently

8   ceased *from 2003 until now* Dr. Rafi's *(plaintiff)* in-demand and highly paid professional clinical

9   cytogenetics career job opportunities around the nation as well *(Exhibits 2,3,4,5)* – which

10   effectively rendering him as a *"pariah"* in his specialized professional clinical cytogenetics and

11   medical genetics community around the nation, and consequently, he is a persecuted *"pauper"*

12   today.  Moreover, actions for multistate defamation is governed by laws of states where principal

13   harm to reputation occurred (see, *Brewster v. Boston Herald- traveler Corp.* (D. Mass. 1960);

14   *Harvard Law Review*, vol. 74, No. 7 (May 1961), pp. 1457-1461).

15

16   **SECTION 1915: PROCEEDINGS IN FORMA PAUPERIS**

17   Our conclusion today is consonant with Congress' overarching goal in enacting the *in forma*

18   *pauperis* statute: "to assure equality of consideration for all litigants." *Coppedge v. United States,*

19   369 U. S. 438, 369 U. S. 447 (1962); H. R. Rep. No. 1079, 52d Cong., 1st Sess., 1 (1892); 490 U.

20   S. 329.

21   Given Congress' goal of putting unfortunate indigent plaintiffs / appellants on a similar

22   footing with paying plaintiffs, petitioners' interpretation cannot reasonably be sustained.

23   According opportunities for responsive pleadings to indigent litigants commensurate to the

1  opportunities accorded similarly situated paying plaintiffs is more important <u>because indigent</u>

2  <u>plaintiffs so often proceed *pro se,* and therefore may be less capable of formulating legally</u>

3  <u>competent initial pleadings.</u> *Haines v. Kerner,* 404 U. S. 519, 404 U. S. 520 (1972); [*Footnote 9*].

4  -------------------------------------------------------------------------------------------------------

5  ### I. 2. <u>42 U.S.C § 1985: ANALYSIS</u>

6  ### CAUSE OF ACTION UNDER 42 U.S.C. § 1985

7  *CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS AND CONSTITUTIONAL RIGHTS*

8  In this civil action, under 42 U.S.C. § 1985(3) plaintiff alleges "class and race- based

9  conspiracy" that ceaselessly and recklessly deprived plaintiff of his Civil Rights and Constitutional

10  Rights to this day.

11  Conspiracies by powerful groups of individuals (*such as defendants in this case*), or by powerful

12  corporations (*such as, Harvard University, Brigham and Women's Hospital, Children's Hospital*

13  *Boston and Massachusetts General Hospital in this litigation*), may potentially invade a citizen's

14  Constitutional Rights in a far more serious way than direct action by Government to infringe those

15  rights [See, *First Nat'l Bank v. Bellotti*, 435 U.S. 765 (1978)]. Moreover, a defendant cannot deny

16  the existence of a conspiracy because his or her co-conspirators have any immunity from suit (See,

17  *Macko v. Byron,* 641 F.2d 447, 449-50 (5th Cir. 1981; *White v. Bloom,* 621 F.2d 276, 281 (8th Cir.).

18  cert. denied, 449 U.S. 995 (1980).

19  ### <u>RACE AND CLASS- BASED WHITE-COLLAR SLAVERY AND BONDED LABOR IN</u>

20  ### <u>ACADEMIAIS THRIVING TO THIS DAY</u>

21  Although plaintiff Dr. Rafi is a naturalized citizen for several decades now, most of the

22  Indian or Chinese medical genetics researchers and trainees who come to United States for

23  advancement of their careers are mostly devoid of permanent immigrant status or citizenship

1    status.    Therefore, they are often **possessed and traded like slaves** in academia.    Most

2    unfortunately, if such foreign-born researchers and trainees decide to leave one religion and/or

3    race based power group (*such as, Ashkenazi Jewish vs Christian*) of professors to the other power

4    group, and if their initial power group (*such as, Yale in plaintiff's case*) is against such a move,

5    then, the other less powerful group (*such as, Harvard in plaintiff's case*) will not dare to earn the

6    wrath of the rival power group by offering a position to the researcher or trainee, and consequently,

7    he/she will frustratingly decide to leave this country.    Since plaintiff is a naturalized citizen, he has

8    ended up losing his professional career due to such "*white-collar enslavement practice*" and the

9    "*a severe contest for supremacy*" in academia, which compels the exploitation of foreign born

10   post-doctoral researchers, since they could be minimally paid while exploiting their valuable

11   talents for extended periods.

12        In plaintiff Dr. Rafi's case, even though the medical genetics professionals at Harvard

13   Medical School and elsewhere showed sympathy towards his continuing pitiable plight, to

14   safeguard from any retribution from the Yale group of medical geneticists (Dr.  Lifton, Dr. Bale

15   and Dr. Pober), the Harvard group of medical geneticists chose to meticulously and ruthlessly

16   implement the race and class based conspiratorial coercive retaliation against plaintiff's every

17   professional, non-professional technical and research employment and training opportunities from

18   2004 through  2020 (*Exhibits 2, 4, 8, 9, 13, 22, 23*), given the fact that Dr. Barbara Pober belongs

19   to the domineering and highly influential nation-wide Ashkenazi- Jewish power group in the field

20   of medical genetics. **In this manner, race and class- based white-collar slavery and bonded**

21   **labor in academia is thriving to this day.**

22        The *mafia-like-* ownership and internal trading of minority class and race- new

23   **immigrant trainees and researchers** like plaintiff Dr. Rafi *(who are brown complexioned -Asian*

1    *of East Indian origin - or non-Caucasian from mainland China*) by the highly influential and

2    domineering two competing power groups in academia (*Ashkenazi Jewish- White / Caucasian*

3    *race and upper class- group of medical genetics professionals or by the White Caucasian race and*

4    *upper class*)- in plaintiff's  specialized medical genetics field around the nation **is nothing short**

5    **of modern day White-collar-slavery practice.**  Being a victim of such an enslavement for such

6    a long period of time which has rendered him as a "pariah" in the medical genetics field around

7    the nation since 2004 through 2020, plaintiff does not regret being so open about role of class and

8    religion based competing dominance in academia which demeans constitutionally guaranteed

9    Civil Rights to every citizen, assuring life, liberty to choose, and freedom to move- under the

10   Fourteenth Amendment to the Constitution- even to freed slaves.

11        To put it in a global perspective, the alleged on-going illegal race and class based

12   conspiratorial collusion and continuing coercive / vengeful retaliatory employment discrimination

13   against  plaintiff's job prospects not only at the Harvard University affiliated BWH, CHB and

14   MGH from 2004 to this day, but also around the nation as well is a *"microcosm of Trump*

15   *administration's 'macho' unilateral world-wide influence peddling, punishing with economic*

16   *sanctions against any country daring to import Iran's valuable oil commodity so that Iran's*

17   *economy collapses, and thus Iran could be compelled to curtail its missile technological advances*

18   *as well"*.  Even if this paradigm is acceptable at the international level, ruthlessly and ceaseless

19   subjecting a naturalized United States citizen by fellow citizens with race and class based

20   conspiratorial violations goes against the very spirit of the United States Constitution under the

21   13th and 14th Amendments.

22        It is important to note that Congress enacted the Civil Rights Act of 1871 to enforce the

23   13th and 14th Amendments to the Constitution, which prohibited slavery of any sort and enshrined

1    equal protection and provided remedies to individuals deprived of their Civil Rights and to protect

2    individuals from a wide range of discriminatory conduct.

3           The relevant provision includes 42 U.S.C. Section 1985, which provides a remedy in cases

4    involving conspiracy to interfere with Civil Rights and Federal Constitutional Rights:

5           *"If one or more persons engaged therein do, or cause to be done, any act in furtherance of the*

6           *object of such conspiracy, whereby another is injured in his person or property, or deprived of*

7           *having and exercising any right or privilege of a citizen of the United States, the party so injured*

8           *or deprived may have an action for the recovery of damages occasioned by such injury or*

9           *deprivation, against anyone or more of the conspirators."*

10

11          **Section 1985 (3) [cl.1]-** *Equal Protection and Equal Privileges and Immunities:* provides a

12          remedy for violation of citizen's Federal Constitutional Rights by private conspiracies:

13          *Section 1985(3) [cl.1] provides a remedy for wholly private action which violates the 13th*

14          *Amendment right to be free from the "bandages and incidents of slavery". Virtually any racially*

15          *motivated interference with a person's legal right is actionable.*

16          Notably, the ability to engage in interstate travel is prohibited from interference by wholly

17    private actions, as are other discrete rights identified by the Supreme Court as among the privileges

18    and immunities of national citizenship *(See, Griffin v. Breckenridge, 403 U.S.* at 105-06 *(right to*

19    *interstate travel). Congressional authority to grant a remedy for private violations of these rights*

20    *lies in the Necessary and Proper Clause, U.S. Constitution- article I, § 8, cl. 18.*

21          Thus, U.S.C.§ 1985(3), in principal effect, provides a specific tort law available to attack

22    conspiratorial discrimination based on race and class, and it also provides for joint and several

23    liabilities for members of the conspiracy.

24

25

27

1    **THIRTEENTH AMENDMENT RIGHT TO BE FREE FROM BADGES OF SLAVERY:**

2    **THE IMPLICIT CONSTITUTIONAL RIGHT TO TRAVEL AND RIGHTS GRANTED**

3    **BY THE PRIVILEGE AND IMMUNITIES CLAUSE**

4    Title 42 of the US Code § 1985 can be used to provide a valuable remedy against

5 conspiracies since any conspiratorial activity motivated by racial bias clearly can be reached under

6 Section 1985(3). Moreover, among those rights clearly protected from private conspiracies are the

7 thirteenth amendment right to be free from badges of slavery, the implicit constitutional right to

8 travel and those rights granted by the privilege and immunities clause.

9    42 U.S.C. § 1985(3) can also overlap 42 U.S.C. § 1983 to reach deprivations of

10 constitutional rights which involve state action. Section 1985(3) involves a remedy for

11 conspiratorial deprivation of federal or state statutory rights. Thus, the principal advantage of §

12 1985 over the frequently used 42 U.S.C. § 1983 is that § 1985 has no requirement that the offenders

13 act "under color of law". Therefore, § 1985 provides a remedy against wholly private actors such

14 as all the defendants in this case, for the alleged deprivation of plaintiff's civil as well as

15 constitutional rights.

16                **COLLUSION AND COERCION ARE *"ILLEGAL"***

17    ***"COLLUSION IS A CRIME"****- as has been ruled very recently* in Robert Mueller Russia

18 Case on Nov. 15, 2018 by Judge Dabney Friedrich of the U.S. District Court for the District of

19 Columbia: *Memorandum Opinion: 18-cr-32-2 (DLF): **See,** https://www.yahoo.com/news/trump-*

20 *appointed-judge-hands-donald-041222326.html*

21    ***In the same vein,*** this allegation of "race and class based Conspiracy, Collusion,

22 Coercion, and the ensuing reckless and ceaseless retaliatory discrimination against plaintiff's

23 each and every professional clinical cytogenetics and related employment opportunities at

24 BWH/HMS- ceaselessly and recklessly to this day by defendants constitutes "continuing illegal

1   conspiracy and collusion" for which under 42 U.S.C. § 1985 and 42 U.S.C. § 1986- defendants,

2   Dr. Morton, Dr. Maas,  Dr. Irons, Dr. MacDonald, BWH, CHB, MGH and HMS- are liable.

3        It should be noted that all corporations for-profit as well as not-for-profit are subject to

4   claims under   42 U.S.C. §§ 1985 & 1986. Acts done in furtherance of the alleged conspiracy by

5   defendants have foreseeably caused plaintiff's injuries and deprived his rights. See, *Wright v.*

6   *City of Reno,* 533 F. Supp. 58, 63-64 (D. Nev. 1981); see also, *Martinez v. California*, 444 U.S.

7   277, 285 (1980); see generally, *W. Keeton, Prosser and Keeton: On the law Torts*, §§ 263-73

8   (5th ed. 1984).

9        Moreover, the *"bystander"* liability under 42 U.S.C. § 1986 expands the available

10   even beyond the circle of conspirators.  The "bystander" defendants in Section 1986 claim is

11   liable if he or she knew of the conspiracy and had an opportunity to prevent the harm to the

12   plaintiff and failed to take reasonable action to thwart the conspiracy.  See *Shimman v. Frank,*

13   633 F.2d 468, 469 (6th Cir. 1980) (*under proper circumstances defendant may be liable for mere*

14   *inaction*); *Bergman v. United States,* 565 F. Supp. 1353, 1393-95 (E.D. Mich. 1983) (United

15   States liable for the failure of Justice Department officials to prevent vigilante attacks against

16   Freedom Riders).  42 U.S.C. § 1985 provides for joint and several liability for members of the

17   conspiracy, and each member of the conspiracy is jointly and severally liable for the acts of his

18   or her co-conspirators.

19        It should be noted that 42 U.S.C. § 1986 also provides a basis for recovery against a

20   supervisor who acquiesces in a conspiracy involving subordinates.  Section 1986 expands the

21   available defendants beyond the circle of conspirators.  Therefore, defendants should be liable

22   under 42 U.S.C. § 1985(3) (*Conspiracy to Interfere with Civil Rights and Constitutional Rights)*

23   *and under* 42 U.S.C. § 1986

1  *(Neglect or Refusal to Prevent Conspiracy to Interfere with Civil Rights and Constitutional*

2  *Rights), as well as under other applicable statutes as has been additionally ruled very recently* in

3  Robert Mueller Russia Case on Nov. 15, 2018 by Judge Dabney Friedrich of the U.S. District

4  Court for the District of Columbia: *Memorandum Opinion: 18-cr-32-2 (DLF). See,*

5  *https://www.yahoo.com/news/trump-appointed-judge-hands-donald-041222326.html*

6  *IT IS INDEED A HEINOUS CRIME AGAINST DR. RAFI THAT HAS NOT ONLY DESTROYED HIS*

7  *HIGH-PAYING AND IN-DEMAND CLINICAL CYTOGENETICS CAREER, BUT ALSO HAS*

8  *IRREVERSIBLY AFFECTED HIS PERSONAL LIFE AND PSYCHE.*

9  **SECTION 5 OF THE FOURTEENTH AMENDMENT:**

10  ***CONGRESS PROVIDED A REMEDY FOR CONDUCT BY PRIVATE PARTIES (SUCH AS***

11  ***DEFENDANTS) WHICH DEPRIVE CITIZENS OF FOURTEENTH AMENDMENT RIGHTS***

12  It seems that in exercising the enforcement powers provided under the Section 5, "Congress

13  was not limited to remedying inequalities which the courts would determine to be violative of the

14  Constitution. It may prohibit conduct which would not otherwise be unlawful in order to secure

15  the guarantees of the Fourteenth Amendment." (See *Cox, The Supreme Court, 1965 Term--*

16  *Foreword Constitutional Adjudication and the Promotion of Human Rights,* 80 H. Av. L. REY.

17  91, 107 (1966).

18  **THE LEGISLATIVE HISTORY OF SECTION 1985**

19  The legislative history of section 1985(3) supports the notion not only that conspiracies by

20  private individuals (*such as defendants*) to deprive citizens of the fourteenth amendment right to

21  equal protection of the laws were conceptually possible but also that the statute was enacted to

22  protect citizens against precisely such a deprivation.

23  42 U.S.C. § 1985(3) provides citizens with a cause of action against private conspiracies

24  to violate constitutional rights and civil rights. Again, it should be noted that no state action

1    prerequisite exists for such lawsuits.   The Act permits an aggrieved citizen to sue private

2    individuals (*such as defendants*) who have conspired to deprive the citizen of constitutional rights.

3                          **42 U.S.C. § 1985(3) COVERS PRIVATE CONDUCT**

4            Supreme Court now construes Section 1985(3) to cover private conduct (See, *Griffin v.*

5    *Breckenridge*, 403 U.S. at 104-06) that is alleged in this complaint, wherein, defendants have

6    violated plaintiff's constitutional provisions as well (See, *Bray v. Alexandria Women's Health*

7    *Clinic*, 506 U.S. 263, 274 (1993); *Griffin v. Breckenridge*, 403 U.S. at 104-06).2

8            Moreover, United States Court held in *Griffin v. Breckenridge,* 403 U.S. 88, 91 S. Ct. 1790,

9    29 L.Ed.2d 338 (1971)) that no showing of state action is required to sue under section 1985(3).

10   In accordance with the requirements under 42 U.S.C. § 1985(3), this complaint alleges:

11       (1) A conspiracy;

12       (2) To deprive plaintiff of equal protection, equal privileges, and immunities;

13       (3) An act in furtherance of the conspiracy; and

14       (4) An injury or deprivation resulting therefrom (See, *Tilton v. Richardson*, 6 F.3d

15           683, 686 (10th Cir. 1993).

16           This complaint indicates an agreement and concerted action as well as the existence of a

17   discriminatory motive to deprive plaintiff of equal protection, equal privileges, and immunities

18   (See, *Babbar v. Ebadi*, 2000 U.S. App. LEXIS 11798 (10th Cir. 2000).

19           In this complaint, plaintiff furnishes a genuine factual basis to support the existence of the

20   defining elements of the conspiracy—agreement and concerted action (See, *Crabtree v.*

21   *Muchmore*, 904 F.2d 1475, 1476 (10th Cir. 1990)).

1    With respect to the alleged ceaseless and reckless retaliatory discriminatory motive,

2    plaintiff asserts some class-based and some racially discriminatory motive lurking behind the

3    reckless and ceaseless conspiratorial activities.

4    Defendants in this case, Dr. Morton, Dr. Maas, Dr. Irons and Dr. MacDonald- who are all

5    Harvard University's senior faculty members at its affiliated primary research and academic

6    medical centers (BWH, CHB and MGH)- all belong to *Caucasian white; majority race and class;*

7    *Christian / Jewish faiths,* in race and class based conspiratorial collusion with Dr. Lifton and  Dr.

8    Bale at Yale, and Dr. Pober and Dr. Irons at Harvard  affiliated CHB (both *Caucasian white male;*

9    *majority  race;  Jewish  faith)*-  are  alleged  to  have  abused  "their   personal  and  professional

10   influence" in the field of medical genetics at Harvard Medical School (BWH/CHB) and elsewhere

11   and thus violated Dr. Rafi's (*plaintiff: who is a person of color, racial minority, East Indian/Asian*

12   *male; and of minority Islamic faith)* Civil Rights as well as Constitutional Rights, which has

13   resulted in irreversible losses of plaintiff's high-paying and in-demand professional clinical

14   cytogenetics career, rendering him a "*pauper*", with irreversible losses to his personal life and

15   psyche.

16   YSM  through  Dr.  Lifton  and  Dr.  Bale  (both  *Caucasian  white  male;  majority  race;*

17   *Christian / Jewish faith)*  conspired with Dr. Barbara Pober (*Upper class- Ashkenazi-Caucasian*

18   *race- Jewish- American female professor at the YSM- Department of Genetics until 2004*) whom

19   YSM  understandably  only  tentatively  terminated / removed  from  her  faculty  position  at  the

20   Genetics Department in order to deny Dr. Qumsiyeh (*Palestinian, brown complexioned, Arab-*

21   *Middle Eastern- minority race and class; male* ), a *prima facie* case of racial discrimination and

22   retaliation for having exercised his First Amendment Right of Free Speech and for his passionate

23   devotion to pro-Palestinian and anti-Israeli political activism (*while being a faculty member at the*

32

1   *Genetics Department, YSM, under the chairmanship of Dr. Lifton*)- for the termination of his

2   associate professor- faculty position and his directorship of the clinical cytogenetic diagnostic

3   laboratory at the Genetics Department, YSM.

4        *It should be noted that Dr. Qumsiyeh, in fact, had fore-warned YSM and YU authorities,*

5   *via email circular against terminating his position.*

6        Thus, in order to exclusively ward off any legal action against Yale *by the dismissed*

7   *disgruntled Arab-Palestinian minority faculty member* (Dr. Qumsiyeh), Yale also chose to

8   simultaneously (*but only tentatively!*) terminate the position of a *Jewish- Caucasian female faculty*

9   *member* (Dr. Pober) at the Genetics Department, despite the fact that Dr. Pober's service as a

10  clinical geneticist was needed at Yale and her husband serves as a senior and  influential tenured

11  professor, Director, and Vice-Chair at Yale School of Medicine.

12       Therefore, Dr. Pober assumed only a tentative research faculty position at the Children's

13  Hospital Boston (CHB) at Harvard Medical School (*understandably, pre-arranged by Yale*) so

14  that she could be hired back at YSM- in accordance with the stealth agreement between Dr. Lifton,

15  and Dr. Pober.

16       It is further alleged herein that Yale had planned to hire back Dr. Pober after a while using

17  Dr. Rafi (*plaintiff*) as a witness against Dr. Qumsiyeh, since he had worked under Dr. Qumsiyeh,

18  and more importantly, and he had written a confidential complaint against Dr. Qumsiyeh at the

19  behest of Dr. Lifton *(but stressing therein that he could not be utilized as a witness against Dr.*

20  *Qumsiyeh (Exhibit 16),* and accordingly, plaintiff did not want to take up a position at Yale School

21  of Medicine's Genetics Department after the completion of his professional clinical cytogenetics

22  board (*American Board of Medical Genetics; ABMGG*) training, to avoid being compelled by Dr.

1    Lifton (Yale) to serve as a witness against Dr. Qumsiyeh, and also wished to settle in Boston

2    instead by securing a professional faculty position at BWH.

3          Moreover, after the completion of the ABMG- professional clinical cytogenetics training

4    at YSM at the Genetics Department, plaintiff had been positively interviewed at Harvard Medical

5    School for a professional clinical cytogenetics position by Dr. Cynthia Morton and plaintiff very

6    much wanted to take up a position in Boston, as the email evidencing would attest to *(Exhibits 11,*

7    *8)*.

8          But exclusively due to the alleged conspired plan to hire back Dr. Pober, and to use plaintiff

9    as a witness against Dr. Qumsiyeh (*in case Dr. Qumsiyeh grudgingly files a racial discrimination,*

10   *retaliation and First Amendment violation complaint against Yale University upon rehiring Dr.*

11   *Pober*), Dr. Lifton (Yale) "conspired with defendant, Dr. Morton" *(Caucasian- White race and*

12   *class; majority Christian faith*) at BWH/HMS, and prevented her from any further consideration

13   of plaintiff for the interviewed professional clinical cytogenetics position at Dr. Morton's

14   diagnostic clinical laboratory at BWH, as has been alluded to by Dr. Morton in her email to

15   plaintiff *(Exhibit 7)*, and which was also conveyed to Dr. Rafi orally by Dr. Frederick Bieber

16   (Associate Director of clinical cytogenetics laboratory along with Dr. Morton *(Exhibit 14)*.

17         Consequently, plaintiff's high paying clinical cytogenetics career as well as his medical

18   genetics academic career came to a halt, as Dr. Morton refused to consider more than 3 dozen

19   clinical cytogenetics job applications at her ever-expanding diagnostic cytogenetics laboratory

20   from 2004 through 2020 *(Exhibits 2, 4, 8, 9, 13, 22, 23)*, and plaintiff's professional clinical

21   cytogenetics job  applications around the nation as well were never considered to this day due to

22   the "*continuing domino effect*" of the race and class based conspiratorial collusion, coercion /

23   vengeful employment discrimination against plaintiff (*for his refusal to take up a position at YSM*

1   *to facilitate the return of Dr. Pober)*-- which was initiated and perpetuated by defendants Dr.

2   Morton, Dr. Maas, Dr. Irons, Dr. MacDonald, and by co-conspirator Dr. Pober- all at Harvard

3   Medical School affiliated BWH, CHB, and MGH--that arrested and permanently destroyed Dr.

4   Rafi's professional clinical cytogenetics career as well as medical genetics career.

5       Thus, this case is the culmination of a class-based, racial and religious bias in firing, re-

6   hiring practice by Yale, and its consequent ceaseless and reckless retaliatory discrimination and

7   violation of plaintiff's Civil and Constitutional Rights. Dr. Lifton along with Dr. Bale (*on behalf*

8   *of Yale*) *were instrumental in orchestrating and initiating these alleged violations whose*

9   *repercussions are the continuing cause of the deprivation of plaintiff equal protection of the laws,*

10  *equal privileges and immunities under the laws.*

11  **LOOKING BACK AT THIS NATION'S HISTORY OF HUMAN RIGHTS, AFTER THE**

12  **ABOLISHMENT OF SLAVERY DURING 1865 VIA THIRTEENTH AMENDMENT TO**

13  **THE CONSTITUTION**

14      It is indeed the Fourteenth Amendment that guaranteed Civil rights and freedom to move

15  even to the slaves who moved to the Northern slavery- free States (*which is akin to plaintiff, Dr.*

16  *Rafi's move during 2004 from Yale School of Medicine, New Haven, Connecticut, to Boston,*

17  *Massachusetts State, to take up a position at Harvard Medical School, given Dr. Morton's interest*

18  *in his candidacy for a professional clinical cytogenetics position at her diagnostic cytogenetic*

19  *laboratory at Brigham and Women's Hospital, HMS, Boston*), escaping from their possessive

20  initial slave owners in the State of Tennessee (*which is akin to Dr. Lifton at Yale University School*

21  *of Medicine in the State of Connecticut claiming back possession of Dr. Rafi (plaintiff),*

22  *disregarding plaintiff's written plea to let him take up the position at Dr. Morton's laboratory at*

23  *HMS after having completed his professional medical genetics training at Dr. Lifton's Genetics*

24  *Department at Yale: **Exhibit 16**).*

1       Just like the *"slavery free Northern States"* were required to capture and return the escaped

2   slaves back to their initial slave owners in the Southern States under *"the Fugitive Slave Law"*,

3   which was also called "*Blood Hound Law*" for the <u>dogs</u> that were used to track down the runaway

4   slaves (<u>see</u>, *Lennon Canor (2016-08-01).*

5       *"Slave Escape, Prices, and the Fugitive Slave Act of 1850". The Journal of Law and*

6   *Economics, 59, (3): 669-695.), <u>"as a modern-day white-collar slave", Dr. Rafi (plaintiff) was</u>*

7   <u>*captured by defendant, Dr. Morton (BWH/HMS) and being held until now by Yale*</u> *through some*

8   *race and class- based illegal conspiratorial collusion with defendant, Dr. Morton at HMS, which*

9   *compelled Dr. Morton to recklessly and ceaselessly refuse  consideration of any of Dr. Rafi's*

10   *several dozen professional clinical cytogenetics job applications at her diagnostic laboratory, at*

11   *her medical genetics research laboratory, and also motivated her to negatively influence her*

12   *colleagues to prevent Dr. Rafi being hired by them instead.*

13       It is important to note that even during the period of *"Fugitive Slave Law"*, the Supreme

14   Court in the case of *Prigg v. Pennsylvania* (1842) ruled that <u>free Northern States did NOT have to</u>

15   <u>offer aid in the hunting or recapturing of *"escaped slaves"*</u> from the Southern States.

16       After the abolishment of slavery, it is the Fourteenth Amendment to the Constitution that

17   unambiguously linked citizenship (*certainly NOT excluding naturalized citizenship!*) to Civil

18   Rights, assuring life, liberty to choose, and freedom to move- even to <u>freed slaves.</u>

19       The Fourteenth Amendment to the Constitution indeed provided for federal government

20   oversight to protect the Civil Rights and the Constitutional provisions, meaning that anyone,

21   including naturalized citizens *<u>(such as plaintiff in this case),</u>* freed slaves, and the native Indians-

22   could appeal to the federal government to protect their Fourteenth Amendment rights, *as plaintiff,*

23   *Dr. Rafi in this case is currently engaged in.*

1                  **II. 2. <u>42 U.S.C § 1986: ANALYSIS</u>**

2                **CAUSE OF ACTION UNDER 42 U.S.C. § 1986**

3   <u>IT UNLAWFUL TO NEGLECT OR REFUSE TO PREVENT CONSPIRACY TO INTERFERE</u>

4            <u>WITH CIVIL RIGHTS AND CONSTITUTIONAL RIGHTS</u>

5       Unlike 42 U.S.C. § 1985(3) above, <u>*42 U.S.C. § 1986 creates a legal duty for defendants to*</u>

6 <u>*have effectively interjected to rectify*</u> the continuing detrimental repercussions of the illegal

7 conspiracy that had crippled plaintiff's professional and scientific career, that too, when plaintiff

8 desperately pleaded with Dr. Morton (BWH/HMS) and others at HMS to intervene to end the

9 continuing reckless coercive and retaliatory job discrimination at HMS and around the nation.  To

10 this effect, plaintiff has several emails *(**Exhibits  9, 10, 8, 16, 22, 23**)* and phone records of having

11 repeatedly pleaded defendants, Dr. Morton and others at HMS (*as well as Dr. Lifton and Dr. Bale*

12 *at YSM*)  to rectify the on-going coercive ceaseless and reckless retaliations against plaintiff's

13 professional candidacies at BWH/HMS.

14       It should be noted, when plaintiff approached Dr. Lifton with his willingness to take up

15 even a non-professional research position at his Genetics Department to resolve the detrimental

16 stand-off and to facilitate the return of Dr. Pober back to YSM, a day long phone communication

17 with Dr. Lifton at Yale School of Medicine through his secretary and himself did not rectify the

18 untenable situation *(**Exhibit 8**)*.

19      <u>Therefore</u>, plaintiff, upon establishing an underlying conspiracy claim under § 1985(3)

20 above, extends the reach of liability with § 1986, since Section 1986 reaches more broadly than

21 Section 1985, its predicate, by inculpating even bystander defendants, such as, Dr. Morton, Dr.

22 Maas and others at HMS, even if they are not the planners and beneficiaries of the alleged

23 conspiracy.

1    **42 U.S.C. § 1986 is unique among American Civil Rights statutes in creating liability-**

2    even when a defendant has neither personally committed a discriminatory act, nor engaged in a

3    conspiracy to do so, nor acted with discriminatory intent.  Even a negligent failure to protect by an

4    actor with knowledge of a Section 1985 conspiracy and power to protect its victims is actionable

5    (See *Clark v. Clabaugh,* 20 F.3d 1290, 1298 (3d Cir. 1994).  Further, a plaintiff need not prove

6    that a Section 1986 defendant had the discriminatory intent requirement of Section 1985 (See

7    *Clark v. Clabaugh,* 20 F.3d 1290, 1293-94, 1298 (3d Cir. 1994)), rather, the plaintiff need only

8    demonstrate:

9        (1) The defendant had actual knowledge of the Section 1985 conspiracy;

10       (2) The defendant had the power to prevent or aid in preventing the commission of the

11           Section 1985 violation;

12       (3) The defendant neglected or refused to prevent the § 1985 conspiracy; and

13       (4) A wrongful act was committed by the conspirators. (See, *Clark v. Clabaugh,* 20 F.3d

14           1290, 1295 (3d Cir. 1994); also see, Chester J. Anteau & Gary E. Bair, Federal Civil

15               Rights Acts:

16           Civil Procedure § 281 (2d ed. 1980 & Supp.1995).

17       <u>Even knowledge of rumors may satisfy the first element</u> (See, *Clark,* 20 F.3d at 1296-97).

18   The defendant is liable for all damages that he or she could have prevented with reasonable

19   diligence (See, *Clark*, 20 F.3d at 1298).

20       While **Section 1985** defendant must be a conspirator and must have joined in the illegal

21   conspiracy by at least manifesting his or her agreement with the conspiratorial plan, evidence of

22   mere encouragement of the conspiracy rather than direct participation may suffice to establish

23   coconspirator liability under Section 1986, and it requires no such direct connection to the

38

1    conspiratorial agreement. It attaches liability for culpable inaction. It renders responsible those

2    whose knowledge places them closest to the underlying conspiracy, regardless of whether they

3    acted affirmatively.-----------------------------------------------------------------------------------------

4    -

5    ## III. ARGUMENTS

6         A cursory look at plaintiff's career indicates an abrupt and permanent end to his promising

7    professional clinical cytogenetics career since successfully completing his professional ABMGG-

8    board training in medical genetics training program during 2002- 2004 period under the

9    chairmanship of Dr. Lifton at the Genetics Department (YSM), instead of blossoming, despite the

10   fact that plaintiff has had nearly a decade of successful professional clinical cytogenetics career

11   prior to his completion of the professional board training in clinical cytogenetics, as follows *(also*

12   *see, Exhibit 18):*

13   **(1)** Maryland State licensed Director of Clinical Cytogenetics laboratory (1992-93);

14   **(2)** Associate Director of Clinical Cytogenetics at the Armed Forces Institute of Pathology (AFIP),

15        Walter Reed Army Medical Center (*WRAMC; US-Dept. of Defense*), Washington, DC (1990-92);

16   **(3)** Senior Clinical Cytogeneticist at the Laboratory Corporation of America, Raleigh, NC (1998-99);

17   **(4)** Research Clinical Cytogeneticist at Duke University Medical Center, Durham, NC (1989-00), and

18   **(5)** New York State-Clinical Cytogenetic Laboratory- supervisor certification (1988),

19   as partially presented below:

20   • Clinical Cytogenetics- ABMG- Trainee, and Cytogenetic Technologist, Department of Genetics,
21     Yale University School of Medicine, New Haven, CT. Jan. 2001- Dec. 2003.
22
23         *Employer*: Yale University School of Medicine; 333 Cedar Street, New Haven, CT 06510
24
25         *Ending job title*: Medical Genetics / Cytogenetics Fellow
26
27         Responsibilities & Publications:
28
29         Clinical cytogenetics diagnostic responsibility included bone marrow and solid tumor cytogenetics,
30         as well as undergoing ABMG medical genetic trainings.
31
32         This diagnostic medical genetic training should also serve me well in professionally executing the duties

of this clinical genomic diagnostic test development!!!

During this medical genetics training at Yale, the following clinical molecular cytogenetic publications were accomplished:

ETV/CBFA2 Fusions in Childhood B-Cell Precursor Acute Lymphoblastic Leukemia with Myeloid Markers. Syed K. Rafi, Howeida Elgebaly, and Mazin B. Qumsiyeh.
*Diagnostic Molecular Pathology 9(4): 184-189, 2000.*

Double Supernumerary Isodicentric Chromosomes derived from 15 resulting in Partial Hexasomy. Mazin Qumsiyeh, Syed Rafi, Catherine Sarri, Maria Grigoriadou, Jolanda Gyftodimou, Effie Pandelia, Hara Laskari, Michael B. Petersen.
*American Journal of Medical Genetics 116A (4): 356-359, 2003;*

- Visiting Scientist, Genome Center, North Carolina State University, Raleigh, NC. Jan 2000- 02;

- Associate Research Cytogeneticist, Duke University Medical Center, Durham, NC. 1999- 00;

- Senior Clinical Cytogeneticist, Lab. Corp. of America, Research Triangle Park, NC. 1998- 99.

- Visiting Scientist, Armed Forces Institute of Pathology, Walter Reed Army Medical Center, Washington DC. 1993-95.

   Responsibilities & Publications:

   Served as Principal Investigator for the Department of Defense funded genetic research project to study the effect of hyperoxia and caffeine on the expression of Fragile-X (q27.3) that resulted in the following publication:

      Effects of hyperoxia and caffeine on the expression of fragile site at Xq27.3.
      S.K.Rafi, R,B.Surana, L.H.Anderson. K.L.Christopher. B.Wilson and W.J.Mehm.
      *American Journal of Medical Genetics 1996: 61:4 : 299-303.*

- Director, Clinical Diagnostic Cytogenetics Laboratory, Providence Lab. Associates, Rockville, MD. 1992- 94.

   *Established a Brand New CLIA- certified & State of Maryland Certified Clinical Cytogenetics Laboratory, And I Was Issued State of Maryland's Director of Clinical Cytogenetics Laboratory License To Operate the Laboratory.*

- Associate Director, Clinical Cytogenetics Division, Armed Forces Institute of Pathology, Walter Reed Army Medical Center, Washington, DC. 1990-92.

   Responsibilities & Publications:

   Cancer and Leukemia-Group-B (CALGB) - NCI- Institutional Cytogeneticist at the Armed Forces Institute of Pathology, Walter Reed Army Medical Center, Washington, DC.

   Directed the cytogenetic training course; secured a Department of Defense research grant to conduct genetic studies to study the effect of hypoxia; and the findings were published later:

   Effects of hyperoxia and caffeine on the expression of fragile site at Xq27.3.
   S.K. Rafi, R, B. Surana, L.H. Anderson. K.L.Christopher. B.Wilson and W.J.Mehm.
   *American Journal of Medical Genetics 1996: 61:4 : 299-30.*

   Constitutional heteromorphism of 9q 13-q21 in a patient
   with chronic myelogeneous leukemia. R.B.Surana, S.K.Rafi. K.L.Christopher, T.J.Reid

and R. B. Weiss.
*Clinical Genetics 1995:47(6):320-322.*

• New York State-Clinical Cytogenetic Laboratory- supervisor certification (1988),

---------------------------------------------------------------------------------------------------------------------

**Given** Dr. Qumsiyeh's highly involved local and international pro-Palestinian and anti-

Israeli political activism, often from YSM academic office at the laboratory, <u>as has been only</u>

<u>partially documented below:</u>

http://archive.adl.org/israel/qumsiyeh/default.html#.VoLdT_krLak
http://archive.adl.org/campus/campus_incidents.html
http://archive.adl.org/israel/qumsiyeh/#.VoLe7vkrLak
http://www.salem-news.com/articles/march012010/mazin-folo-mq.php
http://www.countercurrents.org/qumsiyeh030310.htm
salem-news.com/articles/june092010/**mazin-arrest-**tk.php\

**Jun 08, 2010** · We are alarmed and concerned in reporting that **Dr. Mazin Qumsiyeh** PhD, has
been **arrested** by border police while involved in a nonviolent political direct ...

Israeli Soldiers **Arrest Dr. Mazin Qumsiyeh** for...
salem-news.com/articles/november132011/**mazin-arrest**.php
**Nov 12, 2011** · ... Salem-News.com writer **Dr. Mazin Qumsiyeh** was **arrested** in Al-Walaja this
morning ... Jun-09-2010 Salem-News.com Writer **Arrested** After **Protest** Near ...

**Dr. Mazin Qumsiyeh** describes his attack and **arrest** on Nakba ...
electronicintifada.net/blogs/nora-barrows...
You are here **Dr. Mazin Qumsiyeh** describes his attack and **arrest** on Nakba day

**Dr. Mazin Qumsiyeh** Faces **Arrest** by IDF -...
www.wrmea.org/action-alert-archives/**dr.-mazin-qumsiyeh**...
**Dr. Mazin Qumsiyeh** Faces **Arrest** By IDF. Israel has cracked down hard on nonviolent
resistance arresting dozens of activists in Bi'lin, Ni'lin, Al-Masara, and

**Mazin Qumsiyeh** | The Electronic Intifada
electronicintifada.net/tags/**mazin-qumsiyeh**
Several activists were **arrested** by Israeli ... How two 69-year-old women challenged Israel's
restrictions on Welcome to Palestine **protest**. ... **Dr. Mazin Qumsiyeh,** ...

Keep **Mazin Qumsiyeh** Free & Organize to Challenge...
www.endtheoccupation.org/article.php?id=2568
**Dr. Mazin Qumsiyeh,** ... **Qumsiyeh** and all other Palestinian nonviolent activists who are
being **arrested** ... Israel responds to Palestinian nonviolent **protest,** ...

Tim King: Is Israel Waging a Military Assault on...

mycatbirdseat.com/2011/05/tim-king-is-israel-waging-a...
... where **Dr. Qumsiyeh** was **arrested**. ... More on **Dr. Mazin Qumsiyeh**. ... Tim King: Is Israel Waging a Military Assault on Intellectuals?

**MAZIN QUMSIYEH**: Israeli army wants me - Intifada Palestine
www.intifada-palestine.com/2010/03/**mazin-qumsiyeh**...
Israeli repression in Palestine is escalating The Israeli army
invaded **Mazin Qumsiyeh** ... **Dr. Qumsiyeh's** ..., **Mazin Qumsiyeh**, nonviolent **protest**,

Three Activists Detained in Nonviolent Action Near...
www.imemc.org/article/58888
Israeli forces **arrested** two Israeli activists, and **Dr. Mazin** ... **Dr. Qumsiyeh** said, noting that the **protest** was peaceful and ... Several **Arrested** in Connection ...

Persecuting **Mazin Qumsiyeh** | SocialistWorker.org
socialistworker.org/2010/03/19/persecuting-**mazin-qumsiyeh**
**Dr. Mazin Qumsiyeh** is wanted by the Israeli government for the "crime" of organizing ...
Persecuting **Mazin Qumsiyeh**. ... he was not immediately **arrested**.

Israeli Terror at Rights Activists House by **Mazin** ...
www.countercurrents.org/**qumsiyeh**030310.htm
By **Mazin Qumsiyeh**, PhD. ... a wanted man now for engaging in nonviolent **protest**! ... many examples of people who also did not do any violence and were **arrested**, ...

**Mazin Qumsiyeh** Palestine Today and in the Future - YouTube
www.youtube.com/watch?v=izZVJSY1E48
Video oD Talk by **Dr. Mazin Qumsiyeh** of Bethlehem University Monday, April 7, 2014 @ SFU Harbour Centre, Vancouver, Canada. **Dr. Qumsiyeh** talked about the ...)
.

<u>Plus,</u> any racial discrimination case against Yale by Dr. Qumsiyeh, or any demonstration

by him along with his Middle Eastern colleagues and students alleging racial discrimination for

his job termination might damage Yale University's current close financial and educational ties in

the Middle East, and affect the sentiments of the large Middle Eastern students and faculty at the

Yale campus, <u>as referenced below:</u>

**Big donations to American colleges from the Muslim world ...**
*creepingsharia.wordpress.com/.../big-donations-to-american-colleges-fro...* ;May - 2011 ,18 **Yale University** received $500,000 from Bahrain this January and Stanford University received a $149,97 0 gift from **Saudi** Arabia. Universities ... ; **Schools accept prince's money | Yale Daily News** *yaledailynews.com/blog/2006/01/09/schools-accept-princes-money/* - Jan 9, 2006 **Yale** was passed over last month when controversial **Saudi** Prince Alwaleed ... The **donations** have been accepted by both **universities**, but the ... ; **Yale Selects Daughter of Global Muslim Brotherhood Leader as ...** *www.campus-watch.org/article/id/8144* - Aug 24, 2009 **Yale University President**

42

1   Richard C. **Levin**, said it is extremely useful ... Participants from **Saudi Arabia**, Turkey, India,
2   China and Russia, will be ... ; *Yale* **Selects Daughter of Global Muslim Brotherhood Leader as**
3   **...** *www.campus-watch.org/article/id/8144* :Aug 24, 2009 - According to the report  ; *Yale*
4   *University* selected Muna Abu Sulayman, ... *Yale University* President Richard C. *Levin*, said it is
5   extremely useful to have ... Participants from Saudi *Arabia*, Turkey, India, China and Russia, will
6   be ...  ;   **Archived-Articles:   Why   Did**   *Yale*   **Censor   the   Danish   Cartoons?**
7   *www.americanthinker.com/2009/.../why_did_yale_censor_the_danish.ht...* - Sep 15, 2009 *Yale*
8   *University*, through the Office of the President, Richard *Levin,* freely admitted that she had
9   frequented Saudi *Arabia*…
10

11   <u>Exclusively</u> due to plaintiff's refusal to serve as a witness against Dr. Qumsiyeh, and also

12   due to plaintiff refusal to assume a position at YSM replacing Dr. Qumsiyeh so that plaintiff could

13   be compelled to testify against Dr. Qumsiyeh (despite plaintiff having explicitly refused to do so

14   in his written memos to Dr. Bale and Dr. Lifton, then Chairman of the Genetics Department (YSM)

15   *(Exhibits 10 & 16),* plaintiff's professional clinical cytogenetics employment opportunities that

16   plaintiff may have had at BWH/HMS over these years were ceaselessly, recklessly and coercively

17   were discriminated against, in order to subjugate Dr. Rafi (*plaintiff*), and as revengeful denial of

18   those professional job opportunities *ever since plaintiff's successful completion (during 2004) of*

19   *the professional clinical cytogenetics training at YSM <u>until now</u>.*

20
21   **HARVARD UNIVERSITY PROFESSORS:**
22   DR. MORTON, DR. MAAS, DR. IRONS, DR. MACDONALD, DR. POBER AND OTHERS
23   AT HARVARD'S PRIMARY TEACHING AND RESEARCH INSTITUTIONS: BWH, MGH,
24   CHB, DFCI AND BIDMC--**<u>WILLINGLY AND RELENTLESSLY COLLUDED WITH</u>**
25   **<u>YALE UNIVERSITY IN IMPLEMENTING ITS RACE AND CLASS BASED</u>**
26   **<u>CONSPIRACY.</u>**
27   <u>Whenever plaintiff approached Dr. Morton (*defendant*), she would advise plaintiff to seek</u>

28   <u>a position at YSM instead, as the email</u> *(Exhibits 2, 4)* and other anecdotal evidencing clearly

29   authenticates this claim.  She failed to consider any of plaintiff's cytogenetic diagnostic as well as

1    DGAP- medical genetic research job applications as well as refused to release the Federal

2    Government (NIH) research grant money that was to be shared with defendant Dr. Maas (BWH),

3    to prevent Dr. Maas from hiring plaintiff for his DGAP- research projects (*Exhibit 13*).

4         When Dr. Maas tried to get his share of the common research Federal Grant that was

5    controlled by Dr. Morton, as co-investigator of the DGAP- research project per NIH-grant

6    distribution guidelines, in order to prevent the proposed hiring of Dr. Rafi at Dr. Maas's research

7    laboratory,  Dr. Morton repeatedly refused to release the portion of the funds that belonged to Dr.

8    Maas.  This situation was clearly conveyed to Plaintiff by Dr. Maas, and it has been mentioned in

9    plaintiff's SOS email to Dr. Morton *(Exhibit 13)*.  However, after realizing the ongoing coercive

10   retaliation against Dr. Rafi on behalf of YSM, Dr. Maas subsequently chose to deny consideration

11   of Dr. Rafi' several other job applications at his laboratory despite the availability of funds from

12   several other sources.

13        Defendant, Dr. Morton also refused to consider plaintiff's additional ABMG- Molecular

14   Genetic training candidacies despite plaintiff being an internal candidate applying from within

15   HMS (GCRC/CHB). The ABMG-training program has been continuously funded by the Federal

16   Grant money (NIH- Medical Genetics training grants to Dr. Morton), as has been documented.

17        When plaintiff consulted with the Scientific Director for Harvard Partners Center for

18   Genetics and Genomics (HPCGG) after making appointments to see him *(Exhibit 19)*.  Plaintiff

19   was advised by the HPCGC- Scientific Director that it was consequent to Yale's influence

20   peddling as well as due to Dr. Barbara Pober's (*through her influential colleague at CHB, Dr.*

21   *Irons*) influence peddling that Dr. Morton was unable to consider any of plaintiff's professional

22   clinical cytogenetics position applications at her laboratory, and therefore, Dr. Morton should not

23   be accused of discrimination against plaintiff *per se*.

1    **It should be noted that Dr. Morton (BWH), Dr. Maas (BWH), Dr. Irons (CHB) and**

2    **Dr. MacDonald (MGH)- all tenured senior faculty members of Harvard Medical School,**

3    **while Dr. Pober served as associate professor of Harvard's medical school at CHB and MGH.**

4    **They all proactively and collectively participated in the alleged Yale University's race and**

5    **class based conspiratorial collusion, coercion and retaliatory non-consideration of Dr. Rafi's**

6    **multiple professional job applications rendering themselves as co-conspirators in the alleged**

7    **conspiracy.**

8    Plaintiff believes that Dr. Barbara Pober (*co-conspirator: former Associate Professor of*

9    *Pediatrics at YSM, and serving at CHB/HMS along with defendant, Dr. Mira Irons*) was

10   additionally internally (*from within HMS*) instrumental in causing ceaseless and reckless coercive

11   retaliation against plaintiff's professional clinical cytogenetics and related technological job

12   applications, professional medical genetics training applications, medical genetics research

13   applications, and scientific managerial position, as acts of continuing conspiratorial collusion,

14   coercion, and retaliation at Harvard Medical School- affiliated Brigham and Women's Hospital,

15   Children's Hospital Boston, Massachusetts General Hospital, Beth Israel Medical Center, Dona

16   Farber Cancer Institute, as well as outside of HMS at Tufts University Medical Center, Boston and

17   at Boston University Medical Center.

18   Plaintiff believes that Dr. Irons was also directly responsible for the denial of federal

19   government funded medical genetics- additional training opportunities to Plaintiff while Dr. Irons

20   was serving as the director of the Harvard Medical School-ABMGG-medical genetics training

21   program.

22   In addition, a non-professional- managerial position that Plaintiff had managed to get at

23   the Children's Hospital Boston (HMS) was also subjected to termination falsely indicating that the

1    service was being terminated, although the service continued to operate after Plaintiff's departure.

2    Plaintiff has emails evidencing the abrasive role of Dr. Irons in plaintiff's dismissal from the

3    managerial position at CHB which will be presented to the jury.  Dr. Irons indicated to plaintiff's

4    managerial position- employer at CHB that plaintiff should instead seek a research position at

5    YSM (*to enable her friend and colleague Dr. Pober to be hired back by YSM in accordance with*

6    *the alleged conspiracy plan by YSM).*

7         Plaintiff asserts (*with E-discovery material at hand*) that a genetics research position at the

8    Massachusetts General Hospital (MGH) for which his application was initially entertained by Dr.

9    Marcy MacDonald (*email documentations will be presented as evidence*) soon after plaintiff's

10   completion of the YSM- ABMG-medical genetics training was later denied consideration

11   consequent to Dr. Pober's research affiliation with Dr. MacDonald.  Since then, none of Plaintiff's

12   research applications were considered by Dr. MacDonald.

13        Thus, Plaintiff was subjected to continuing acts of conspiratorial coercive retaliatory-

14   violations since 2004 to this day.  Consequently, he was not considered even for a single interview

15   in response to any of his more than 5 dozen clinical cytogenetics and medical genetics research

16   job applications at various levels and grades, including professional- American Board of Medical

17   Genetics and Genomics (ABMGG)- molecular genetics training and additional clinical

18   cytogenetics training, as well as applications for medical genetics research since 2004 through

19   2020 (*Exhibits 2, 4, 8, 9, 13, 22, 23).*

20        Although during 2013 Dr. Pober found a job opening at the newly founded Quinnipiac

21   Medical Center instead, which is located adjacent to YSM- New Haven area, it is realized that Dr.

22   Pober is still seeking to be hired back at YSM as Chief of Clinical Genetics (as per the repeated

23   YSM job advertisement over these years), where Dr. Pober's husband serves as a tenured Bayer

1    Professor of Translational Medicine; Director, Human and Translational Immunology Program;

2    and as Vice-Chair, Dept. of Immunobiology for the Section of Human and Translational

3    Immunology.

4        Consequent to defendant, Dr. Morton's utter failure to rectify plaintiff's untenable

5    situation, given her personal knowledge of the ongoing conspiracy, plaintiff had to deviate away

6    from his lucrative professional field of diagnostic clinical cytogenetics, and instead, had to survive

7    on very low paying positions in the Midwest region trying to escape from the relentless influence

8    peddling and "vetoing" of plaintiff's professional clinical cytogenetics by the defendants.   On

9    several occasions, in order to survive, plaintiff was forced to take up even labor-oriented jobs with

10   minimum wage, proof of which will be presented to the jury during the trial.

11       It should be noted that prior to the ABMGG training at YSM, plaintiff held full-fledged

12   Director's positions in the very field of clinical cytogenetics, including at the prestigious Armed

13   Forces Institute of Pathology, Walter Reed Army Medical Center, US. Department of Defense,

14   Washington, DC, as has been listed above.

15       But a cursory look at plaintiff's career information indicates an abrupt and permanent end

16   to his promising professional clinical cytogenetics career   since successfully completing his

17   professional board training at Yale School of Medicine during 2002-04, instead of blossoming,

18   despite the fact that plaintiff, as listed above,  has had nearly a decade of successful professional

19   clinical cytogenetics career *prior to his completion of the professional training (American Board*

20   *of Medical Genetics: ABMG / ABMGG)- in clinical cytogenetics during 2001-03 at YSM.*

21       At Harvard Medical School, **Dr. Frederick Bieber** (*a senior associate clinical*

22   *cytogenetics laboratory director who serves along with* **Dr. Cynthia Morton,** informed Dr. Rafi

23   during 2004 that Dr. Richard Lifton (*then Chairman of Yale's Genetics Department*) wanted to

1    offer Dr. Rafi a faculty position as director of clinical cytogenetics (*the same position that was*

2    *held by Dr. Qumsiyeh*) at Yale instead,  thus indicated that he and Dr. Morton could not offer Dr.

3    Rafi a position at their clinical cytogenetics laboratory at BWH /HMS as desired by Dr. Rafi, and

4    this assertion is evident in Dr. Morton's prior initial email reply to Dr. Rafi, dated, December 28,

5    2002 (*Exhibit 11*), wherein **"she encourages Dr. Rafi to try to work something out at Yale,**

6    **where it was clear to her from the reference letters that she had received that Dr. Rafi was a**

7    **valued as a member of the cytogenetics staff at Yale"-** meaning that Yale did not permit her to

8    consider Dr. Rafi for a position at BWH/HMS after the completion of his professional ABMG-

9    training at Yale.

10         However, during March 2003, Dr. Rafi wrote to Dr. Morton after he had successfully

11   completed his professional clinical cytogenetic training at Yale, indicating therein that,

12         **"after sole searching meditation, I have come to the realization that New Haven is not a**

13         **suitable place for me to settle.  I have no ties to New Haven area and feel that the**

14         **atmosphere of a busy city such as Boston would be a better fit for me.** So. If you could offer

15         me a position at your cytogenetics laboratory, I will appreciate it very much.  As you have

16         indicated in your email response, I will certainly benefit from working at your cytogenetics

17         laboratory.  I look forward to hearing from you about a convenient time for us to meet at BWH.

18         Thank you for your consideration." (*Exhibit 11*).

19         During 2005, Dr. Rafi replied to co-conspirator at YSM, **Dr. Maurice Mahoney** (*a senior*

20   *colleague of Dr. Lifton and Dr. Bale at Yale School of Medicine; with concurrent copies to* **Dr.**

21   **Margretta R Seashore** *who is also a senior colleague of* **Dr. Lifton** *and* **Dr. Bale** *at Yale School*

22   *of Medicine and to Dr. Lifton*)- requesting him to relieve him from any consideration for the

23   Director of Clinical Cytogenetics position at Yale, as a replacement for **Dr. Qumsiyeh** (*Exhibits*

24   *7, 9*) *(emphasis added)*:

48

```
1      Date:    Fri, 3 Jun 2005 11:46:38 -0700 (PDT)
2      From:    "Syed Rafi" <rafigene@yahoo.com>
3      Subject: Re: Yale Cytogenetics Directorship...
4      To:      "Maurice Mahoney" <Maurice.Mahoney@yale.edu>
5      CC:      <richard.lifton@yale.edu>   "Richard Lifton"
6      <margretta.seashore@yale.edu> "Margretta R Seashore"
7
8      Dear Dr. Mahoney,
9      Thank you for your email response (18th April 2005) indicating that Yale was already considering a few
10     candidates for its cytogenetics directorship position and was involved in detailed negotiations with them as
11     well.  However, you indicated that you should keep my curriculum vitae on file should those negotiations
12     fail.
13
14     Given (1) the passage of >6 weeks' time since the receipt of your response, (2) my unwillingness now to
15     further sacrifice my career and income (which has been effectively put on-hold by Yale, ever since I
16     left Yale!) until Yale finds and appoints an appropriate replacement for Dr. Qumsiyeh, and (3) my
17     firm desire now to settle in a more urban setting due to my minority ethnic cultural background, I
18     respectfully request you to exclude me now from the backup candidate status as well.
19
       Thank you, and I deeply appreciate your understanding in this matter.
20     With very best regards.
21     Sincerely,
22     Syed K. Rafi, Ph.D.
23
24     Maurice Mahoney <Maurice.Mahoney@yale.edu> wrote:
25     Date:    Mon, 18 Apr 2005 11:27:27 -0400
26     From:    "Maurice Mahoney" <Maurice.Mahoney@yale.edu>
27     Subject: Re: Cytogenetics Directorship: CV for consideration ...
28     To:      "Syed Rafi" <rafigene@yahoo.com>
29     CC:      richard.lifton@yale.edu
30
31     Dear Dr. Rafi,
32
33     Thank you for your interest in our cytogenetics position.  We are currently exploring details of the
34     position with a few candidates.  We shall keep your curriculum vitae on file should these explorations
35     not result in the naming of a director.
36
37     M J Mahoney
38
```

39       During September of 2006 and November of 2007 (*Exhibit 11*) **plaintiff pleaded**

40   **defendant, Dr. Morton** (*Harvard University's tenured senior professor at of Harvard Medical*

41   *School- affiliated academic teaching and research  institution, the Brigham and Women's*

42   *Hospital: BWH)* <u>to relieve him from the clutches of the alleged race and class based conspiracy</u>

43   <u>that had effectively terminated his professional clinical cytogenetics career and denied her</u>

1    consideration of his numerous professional clinical cytogenetics candidacies at her clinical

2    cytogenetics laboratory since 2004.

3          Out of desperation, during 2007, Dr. Rafi wrote to two employment lawyers explaining his

4    stranded situation and seeking their help in resolving it (*Exhibit12*).  Furthermore, during 2009,

5    Dr. Rafi made an appointment and met with then Scientific Director of Harvard-Partners' Genetics

6    and Genomics Center (since he was in-charge of all Genetics and Genomics operations at Harvard

7    Medical School, including that of Dr. Morton (*Exhibit 19*).  He indicated to Dr. Rafi that Dr.

8    Morton could not be blamed for not considering any of his series of clinical cytogenetics job

9    applications for a position at her clinical cytogenetics laboratory since Yale as well as Dr. Pober

10   (from within Harvard) were not allowing Dr. Morton to hire Dr. Rafi.

11         It was also clearly palpable to Dr. Rafi that Dr. Pober (CHB/HMS) was influence peddling

12   at Harvard Medical School through her powerful and abrasive Jewish colleague Dr. Mira Irons

13   (CHB/HMS) , since they both served as Harvard's medical genetics faculty at its primary teaching

14   and academic hospital: Children's Hospital Boston (CHB).  Coincidentally, Dr. Irons' daughter

15   secured admission into Yale college around that period.

16         Consequently, in order to survive, Dr. Rafi decided to assume a non-professional laboratory

17   managerial position in an unfamiliar science field at Children's Hospital Boston (affiliated with

18   Harvard University) with a meager salary.

19         During September 2006, plaintiff sent an email to defendant Dr. Morton and Dr. Bieber

20   seeking consideration of his pending job applications at their clinical cytogenetic laboratory at

21   BWH/HMS, openly indicating therein, *"Due to Yale University's obstruction of my career as a*

22   *Clinical Cytogeneticist outside of Yale, I have been alienated and thus prevented from pursuing*

1    *my professional career in Clinical Cytogenetics at Harvard. ...…..and so now it's unethical and*

2    *even unjust for Yale to keep me in suspension any longer." (**Exhibits 8, 11, 14, 19**).*

3          Moreover, Dr. Rafi, in his December 2006 email to Dr. Morton and Dr. Bieber, has

4    indicated that, *"I reiterate my lack of intention to go back to Yale, even if Yale continues to paralyze*

5    *my professional Clinical Cytogenetics career during the forthcoming year as well.  **This stance is***

6    ***justifiably based on my sense of liberty in the pursuit of my career."*** (emphasis added) (***Exhibit***

7    ***14***). However, realizing that Yale and Dr. Lifton have not allowed their co-conspirator at

8    BWH/HMS, defendant, Dr. Morton to consider any of his job applications until 2008, <u>Dr. Rafi</u>

9    <u>decided to yield to Yale's conspiratorial coercive influence peddling at BWH/HMS.</u>  Accordingly,

10   he sent an email on July 14, 2008 to Dr. Lifton (YSM) (***Exhibit 8***) indicating therein:

11         "If Yale could offer me a permanent associate faculty position with significant enough salary, I will
12         consider it.  This requirement is fully justified given all that has transpired ever since I completed my
13         training at Yale, and it's detrimental effect on my professional career and personal life."

14   As a follow up, on July 21, 2008 Dr. Rafi sent an email to Dr. Lifton (***Exhibit 8***) indicating therein:

15         "I will be glad to come to New Haven to meet with you concerning this matter.  So please let me know
16         your convenient date and time for the proposed meeting."

17   Further, on April 8, 2009 he sent an email to co-conspirator Dr. Pober and to Dr. Bieber (***Exhibits 11, 14***)
18   stating (emphasis added):

19         "If Yale could offer me a permanent faculty position, compensating for the irreversible damages to my
20         career and personal life during this prolonged period, <u>I am willing to consider it as a compromise to</u>
21         <u>break the deadlock.</u>"

22   On October 28, 2009 he sent a confidential email to Dr. Lifton (***Exhibit 8***) stating therein (emphasis added):

23         "As I have indicated in my previous emails, I am willing to take up a research faculty position (as has
24         been indicated) at Yale in order to facilitate the return of Dr. Barbara Pober to Yale.

25         I clearly realize that Dr. Pober merely wants to be able to go back to Yale since her husband/family is well
26         settled at Yale/New Haven, and I am in a position to help facilitate her return while safeguarding Yale
27         against any repercussions.....Dr. Qumsiyeh.....

28         So, I have sent several emails to you indicating my sincere willingness to amicably resolve this standoff
29         (which has been very detrimental to my professional career ever since I left Yale), and requesting a
30         meeting with you in confidence.

1       Please let me know soon your convenient time to meet with me. **In case, you have no plan to offer me a**
2       **position at Yale, please let me know without further delay so that I could inform your decision to my**
3       **other prospective employers to make them feel free to consider my candidacy."**

4  Notwithstanding the above communications, Dr. Rafi sent a confidential and certified US postal mail to
5  Dr. Lifton, dated December 23, 2009 (***Exhibit 8***) stating therein (*emphasis added*):

6       Dear Chairman, Dr. Lifton,
7       With reference to our telephone conversation of December 4, 2009, I would like to clarify the rationale
8       for my July 14, 2008 email to you (and Dr. Pober) suggesting that I be considered for an associate faculty
9       position at Yale with commensurate salary.
10      My grievance stems from the fact that my professional career has been held hostage since my departure
11      from Yale, to Dr. Qumsiyeh's conflict with Yale.  Before I left Yale, I had reported the facts of Dr.
12      Qumsiyeh's situation to you in strict confidence, on condition that the information not to be used for any
13      legal purposes.  My potential usefulness to Yale's defense in the event of a future legal action by
14      Qumsiyeh consequent to Dr. Pober's anticipated return to Yale (given the fact that her husband is a well-
15      established and influential senior clinical faculty at Yale School of Medicine **has landed me in a**
16      **professional limbo.**
17      **Thus, I have, though no fault of my own, been subjected to irreversible damages to my professional**
18      **career and personal reputation, and these damages have in turn wrecked financial and emotional**
19      **havoc.  This grave injustice demands redress by Yale;** even considering me for an associate faculty
20      position will not fully satisfy the requirements of justice!
21      **Although my losses and damages cannot be fully compensated by any job offer at Yale or Harvard, in**
22      **order to amicably resolve the standoff, I am willing to consider a durable junior faculty position with**
23      **salary adequate to at least partially cover my losses and irreversible damages during these years.**  I
24      would also require your assurance that you will support me in establishing a research career in the field of
25      medical genetics and/or stem cell biology.
26      Please let me know your decision before the end of this year in order to prevent further damage to my
27      career.
28      Best regards,
29      Very sincerely,
30      Syed K. Rafi, PhD.

32      On July 26, 2010, Dr. Rafi emailed to Dr. Lifton (***Exhibit 8***) (*emphasis added*) seeking his
33  recommendation for a medical genetics research job opportunity at BWH/HMS at defendant, Dr. Richard
34  Maas's laboratory *(Dr. Maas is well known to Dr. Lifton as the Chief of Genetics at Department of Medicine*
35  *at BWH/HMS)*, since Dr. Maas had shown interest in Dr. Rafi's candidacy for the medical genetics research
36  job opportunity *(emphasis added)*:

37      **On July 25, 2010, 1:31 PM, "Syed Rafi" <rafigene@yahoo.com> wrote:**

39      Dear Chairman, Dr. Lifton,
40      During our last conversation, you advised me to seek ABMG cytogenetics training outside of Harvard.
41      Although I felt it to be odd given my demonstrated interest to undergo the training at Harvard itself given
42      my long-term working affiliation with HMS ever since I left Yale, I have indeed sought such training several
43      times at Boston University and Tufts University- Medical Centers in Boston, and elsewhere as well, **but**

1   they all justifiably suggested that Harvard should be able accommodate me given my recent working
2   relationship, and it is logical to realize that they all would have contacted Dr. Cynthia Morton to know
3   the reason for her inability to accommodate me all these years given my proximity and close
4   affiliation...... However, even if I wish to leave Boston to do a fellowship elsewhere, there are no
5   available openings for more than a year from now.

7   The fact that my last position at Children's Hospital Boston was not renewed since Dr. Irons had
8   informed my Supervisor that I will be going to Yale instead, but since you could not offer me a position,
9   I am held jobless for almost a year now, and I can't afford to be jobless for another year waiting for a
10  cytogenetics fellowship opening.  Further, despite my ardent efforts, ever since I left Yale, I have had
11  no opportunity to practice diagnostic cytogenetics, and consequently have lost my interest in pursuing
12  exclusively a diagnostic cytogenetics career.  Since I have always been interested in research, and have
13  been an active and regular participant in various research seminars at Harvard and Broad (MIT) over these
14  years, I have decided to pursue a research career instead, combining my experience in clinical
15  cytogenetics and molecular genetics, and my interest in stem cell genetics, so that I could move on with
16  my life, given the fact that now Dr. Pober is well settled here at Harvard itself (and FYI, I have, and will
17  always hold Dr. Pober in high regard).

19  After a prolonged search, I have found such a research opportunity at Dr. Richard Maas's laboratory at
20  BWH.  Dr. Maas, as you know, is the Chief of Genetics at Department of Medicine, and has several
21  research projects that require exactly the skill sets that I possess, and he has shown interest in my
22  candidacy. So, I again request your recommendation for this research position.  You may contact Dr.
23  Maas at 617 525 4704, and I thank you in advance for your crucial recommendation.
24  With best regards,
25  Syed K. Rafi, PhD.

27  Again, on 2nd March 2011, Dr. Rafi again passionately wrote to Dr. Lifton (*Exhibit 8*) (*emphasis added*):

28  From: Syed Rafi <rafigene@yahoo.com>
29  To: richard.lifton@yale.edu
30  Sent: Wednesday, March 2, 2011 9:34 PM
31  Subject: Strictly Confidential and Personal...
32  Dear Dr. Lifton,

33  With reference to my prior email (below), I regret to inform you that despite mentioning your name as
34  referee, Dr. Cowan (the Medical Genetics Program Director at Tufts University) has also declined to
35  consider me for the supple mental clinical cytogenetics training.

36  Ever since leaving Yale, I have a record of  having applied at Harvard for more than a dozen clinical
37  cytogenetic job vacancies at every level, for several research positions, and for the supplemental clinical
38  cytogenetics training position several times; alas, none were  (ever allowed to be) considered.  When I
39  accused, officials at Harvard confirmed my understanding of the situation (Dr. Pober's) for the ongoing
40  "non-consideration" of every one of my candidacies.  Thus, after confirming this untenable situation, I
41  have written to you several times indicating my earnest willingness to meet with you in-person to
42  discuss and try to resolve this ongoing sensitive issue.

43  As I have indicated in one of my earlier emails, my General Clinical Research Core (GCRC) – Scientist
44  position at the Children's Hospital Boston was also unjustifiably brought to an end (indicating to my
45  employer that I will  be taking up a research position at Yale instead), despite my employer's resistance to

1    let me go.  But when I approached you, you simply advised me to get the supplemental cytogenetics
2    training completed.  **Consequently, I was deprived of my GCRC position and the income since then, and**
3    **as noted above, my cytogenetics fellowship applications were also not recommended for consideration.**

4    **However, in order to amicably rectify this still ongoing situation (despite your statement to the contrary**
5    **during our last phone conversation), I am willing to consider a research faculty position at Yale that**
6    **compensates reasonably...**

7    **I hope this ongoing damaging situation could still be amicably resolved soon,** and I am earnestly willing
8    to meet with you at your earliest convenience to further discuss this matter in-person.

9    I will call your Secretary Janet in a couple of days to schedule an appointment.
10   Best regards,
11   Syed K. Rafi, PhD.
12
13   Again, on April 26, 2013 Dr. Rafi sent a confidential email to Dr. Lifton (***Exhibit 8***) (*emphasis added*):
14
15   From: Syed Rafi <rafigene@yahoo.com>
16   Sent: Friday, April 26, 2013, 08:27:47 PM EDT
17   Subject: Fw: Strictly Confidential and Personal...
18
19   **Dear Dr. Lifton,**
20   **This is to let you know that the total loss of my professional cytogenetics career and income ever since I**
21   **left Yale is exclusively consequent to Yale's stealthily orchestrated plan to deny Dr. Qumsiyeh a prima**
22   **facie case of racial discrimination for terminating his position at Yale.**
23
24   First, in order to deny Dr. qumsiyeh any legal footing, given his emails to the Dean of Yale School of
25   Medicine(YSM) and other administrative officials earlier warning against any stealth plan to remove him
26   from his position, Yale achieve that goal of denying Dr. Qumsiyeh any  and Yale's plan to use/retain me as
27   a legal witness/shield (given my confidentially submitted report to you, per your request, prior to my
28   leaving yale...a copy of which is with me with your secretary's signature of having received a copy of that
29   report on your behalf...) **to take back Dr. Barbara Pober from Children's hospital Boston after some**
30   **time, who is stranded given the fact that Dr. Pober's husband is serving at yale as a**
31   **professor...). Consequently, Dr. Pober's eagerness to go back to Yale has led to her blocking every one**
32   **of my professional job opportunities at Harvard and beyond with the backing of her colleague, Dr. Mira**
33   **Iron's.**
34
35   <u>**The fact of the matter is that consequent to all these stealth orchestrations by Yale and Dr. Pober, I**</u>
36   <u>**have paid a heavy price by losing all my professional development opportunities and job opportunities**</u>
37   <u>**ever since I left Yale.**</u>
38
39   **Yale has created job openings repeatedly to take back Dr. Pober, and just to buy more safe time,** <u>**that**</u>
40   <u>**advertisements are being repeated for the past couple of years without being filling the position per se**</u>.
41   Best regards,
42   Syed K. Rafi, PhD.
43   ------------------
44        It should be noted that since 2005 through 2015, Dr. Lifton, in his capacity as the Chairman

45   of the Genetics Department at Yale School of Medicine, has been advertising and re-advertising

1    every year or two a clinical geneticist job vacancy in the Human Genetics Journal (***Exhibit 17***)

2    that perfectly fits the qualifications of co-conspirator Dr. Barbara Pober, as an affirmation of Yale's

3    ongoing intention to re-hire Dr. Pober, as per the alleged stealth race and class based simultaneous

4    job terminations of Dr. Qumsiyeh along with Dr. Pober, but wanting to re-hire Dr. Pober along

5    with Dr. Rafi in order to utilize him as a witness against Dr. Qumsiyeh (*despite Dr. Rafi's*

6    *determination not to serve as a witness against Dr. Qumsiyeh, per his confidential memo to Dr.*

7    *Lifton*) deny Dr. Qumsiyeh *prima facie* case of race and class based termination of his faculty and

8    directorship positions given his pro-Palestinian political activism at Yale, which he considered it

9    to be peaceful political activism and freedom of speech under the First Amendment Right, as has

10   been extensively portrayed and alleged in this complaint.

11         Dr. Rafi in his confidential email dated May 31, 2013 (*which was also sent via registered*

12   *mail*) (***Exhibit 8***) (*emphasis added*), referring to Dr. Lifton's 2015 one such repeated job

13   advertisement which was allegedly meant to rehire Dr. Pober, stated *(emphasis added)*:

14   From: Syed Rafi <rafigene@yahoo.com>
15   To: "richard.lifton@yale.edu' <richard.lifton@yale.edu>
16   Sent: Friday, May 31, 2013 11.00 PM
17   Subject: Strictly Confidential …

18   Dear Dr. Lifton,

19   <u>With reference to your current repeat job advertisement with May 1, 2013 deadline for Chief of Medical</u>
20   <u>Genetics at Yale, I hope that it is meant to enable the return of Dr. Barbara Pober back to Yale;</u> **no matter**
21   **what might transpire, the blockade of my professional clinical cytogenetics and medical genetics**
22   **research job opportunities at Harvard and elsewhere (ever since I left Yale) should cease now!**

23   Nearly a couple of years ago, my (CTSA/GCRC) employer at the Boston Children's Hospital was pressured
24   by Dr. Mira Irons, a senior colleague of Dr. Pober at the Children's Hospital, to relieve me from my core
25   laboratory service and administrative position as well, indicating to my employer that I had indicated my
26   willingness (to you) at that time to go back to Yale (…to enable Dr. Pober's return!).

27   Realizing my stranded situation at that time, when I sincerely attempted to resolve my entanglement by
28   offering myself to return to Yale for a research position, my day long to and from telephone contacts with
29   your secretary, and finally with yourself as well, did not yield any resolution (understandably, due to my

55

1        insistence on a research faculty under your direct supervision, rather than being under the supervision of
2        Dr. Pober upon her return to Yale).

3        Again, my career should no longer be held as a hostage to Dr. Pober's return to Yale!
4        With best Regards.
5        Syed K. Rafi, PhD.
6

7        When Dr. Rafi came to know that Dr. Barbara Pober found a position at the newly

8 established Quinnipiac University (***Exhibit 15***) which is proximal to Yale School of Medicine

9 (where her husband is serves as tenured senior faculty) and also proximal to her residence in

10 Guilford, CT., Dr. Rafi sent a note to Dr. Lifton on December 15, 2013 (***Exhibit 8***) (*emphasis*

11 *added*), <u>instead of being able to move back to Yale University School of Medicine proper</u>:

12        **"I am so relieved an engulfed with emotion to realize that Dr. Pober has at last managed to move back**
13        **to New Haven, CT,- neighborhood (at the newly established Quinnipiac University Medical School,**
14        **Hamden, Ct) after her long sojourn at Harvard (consequent to a stealth legal maneuvering by Yale)**
15        **causing total  blockade of my professional job opportunities at Harvard and elsewhere,** and even
16        causing dismissal from my administrative job at the Children's Hospital Boston (indeed a pinnacle of
17        selfishness and total disregard for my career and life!), in order to facilitate her return to Yale, where her
18        husband is a tenured Ensign Professor of Immunobiology, Bayer Professor of Translational Medicine and
19        Professor of Dermatology and of Pathology; Director, Human and Translational Immunology Program;
20        Vice-Chair, Dept. of Immunobiology for the Section of Human and Translational Immunology."

21        But, when Yale <u>repeated </u>its advertisement during 2015 for a position requiring Dr. Pober's

22 qualifications (***Exhibit 17***), Dr. Rafi lost his hope for a resolution of his stranded situation.

23        <u>At Harvard Medical School,</u> Dr. Rafi repeatedly pleaded Dr. Cynthia Morton, Dr. Richard

24 Maas, Dr. Mira Irons, as well as co-conspirators Dr. Barbara Pober, Dr. Fred Bieber and Dr. Marry

25 McDonald, and additionally pleaded Dr. Raju Kucherlapati and several others to consider his

26 dozens of professional clinical cytogenetics as well as medical genetics research and training

27 candidacies over these years, as has been presented in ***Exhibits: 8, 9, 11, 19***).  Despite all these

28 pleadings over these years, none of his candidacies were ever considered even for an interview not

29 only at Harvard Medical School as a whole, but also at the neighboring Tufts University Medical

30 Center, Boston University Medical Center, and around the nation <u>to this day</u>.

1    Given this dire situation, Dr. Rafi was, at times, forced into labor oriented manual jobs in

2   Boston and elsewhere (which will be presented to the jury during the trial process) for his survival.

3   Thus, Dr. Rafi has suffered so much over these years' consequent to the alleged race and class

4   based conspiratorial collusion and coercion.

5    Dr. Rafi intends to obtain pre-trial sworn testimonials <u>from the defendants, their co-</u>

6   <u>conspirators,</u> and other faculty members at Harvard Medical School affiliated academic and

7   research medical centers (BWH, CHB, MGH) as well as from conspirators at Yale School of

8   Medicine, in addition to obtaining formal discovery relating to Dr. Rafi's candidacies at BWH,

9   CHB, MGH (HMS):

**HARVARD MEDICAL SCHOOL:**

1. **Defendant, Dr. Cynthia Morton,** Professor & Director of Clinical Cytogenetics Laboratories, Brigham and Women's Hospital, Harvard Medical School, Boston, MA.

2. **Defendant, Dr. Mira Irons,** Associate Professor of Pediatrics and medical genetics, Children's Hospital Boston, Harvard Medical School. Boston, MA.

3. **Defendant, Dr. Richard Maas,** Professor & Chief of Genetics at Department of Medicine, Brigham and Women's Hospital, Harvard Medical School, Boston, MA.

4. **Defendant, Dr. Marcy MacDonald,** Professor of Neurology, Center for Genomic Medicine, Massachusetts General Hospital, Harvard Medical School, Boston, MA.

5. **Dr. Frederick Bieber,** Professor & Associate Director of Clinical Cytogenetics Laboratories, Brigham and Women's Hospital, Harvard Medical School, Boston, Centers, Boston, MA.

6. **Dr. Raju Kucherlapati,** Professor, Departments of Genetics and Medicine, Brigham and Women's Hospital, Harvard Medical School; former Scientific Director of Harvard-Partners Center for Genetics and Genomics, Harvard Medical School, Boston, MA.

**YALE SCHOOL OF MEDICINE & HARVARD MEDICAL SCHOOL:**

7. **Co-conspirator, Dr. Barbara Pober,** tentatively displaced from Dr. Lifton's Genetics Department at Yale School of Medicine; assumed a temporary research faculty position at Children's Hospital Boston and Massachusetts General Hospital, Harvard Medical School, Boston, MA.

**YALE SCHOOL OF MEDICINE:**

8. **Conspirator, Dr. Richard Lifton,** Currently Adjunct Professor of Genetics and former Chairman of Department of Genetics, Yale University School of Medicine, New Haven, CT.

9. **Conspirator, Dr. Allen Bale,** Director, ABMGG- medical genetics training program, Department of Genetics, Yale University School of Medicine, New Haven, CT.

---

## IV. CONTINUING VIOLATIONS DOCTRINE / CONTINUING CLAIMS DOCTRINE

Beginning with Dr. Morton at BWH/HMS during 2003-04 period if one looks at plaintiff's total lack of professional clinical cytogenetics career (which is high-paying and in-demand: *Exhibit 3*) and his meager earnings (*as is evidenced in his meager social security earnings since 2003*) as well as his current "*pauper*" status, it would be apparent that defendant, Dr. Morton's race and class based conspiratorial collusion with Dr. Lifton (YSM) and Dr. Bale (YSM), and in collusion with Dr. Irons and Dr. Pober from within HMS, these individuals in their zeal to enable Dr. Pober's hiring back at YSM using plaintiff as a potential witness against Dr. Qumsiyeh, as alleged, and given plaintiff's unwillingness to serve as a witness against Dr. Qumsiyeh, as is evidenced in his confidential memos to Dr. Lifton (YSM) and Dr. Bale (YSM) (*Exhibits 10, 16*) and his desire to settle in Boston, as is evidenced in his numerous emails to defendant, Dr. Morton as well as to Dr. Lifton- all together have caused reckless and ceaseless violation of plaintiff's rights under the Fourteenth Amendment to the Constitution which assured unambiguously the Civil Rights to every citizen, assuring life, liberty to choose, and freedom to move- even to freed slaves.

Since all the alleged violations are emanating from the same illegal race and class based conspiracy, collusion and coercion, and continuing unlawful neglect or refusal to prevent the ongoing conspiracy to interfere with Civil Rights and Constitutional Rights, and the ensuing continuous coercion and/or vengeful vetoing of dozens of professional and medical genetics

1   research and training opportunities by defendants Dr. Morton, Dr. Maas, Dr. Irons, Dr.

2   MacDonald, and Dr. Pober at Harvard affiliated academic and research hospitals: BWH, CHB and

3   MGH <u>since 2004 to this day</u>, plaintiff invokes the *Continuing Violation Doctrine / Continuing*

4   *Claims Doctrine* in his allegations of prolonged ceaseless and reckless violations, emanating from

5   the same conspiracy and *unlawful neglect or refusal to prevent the ongoing conspiracy to interfere*

6   *with his Civil Rights and Constitutional Rights* as defined by the U.S. Supreme Court in *National*

7   *Railroad Passenger Corp. v. Morgan,* 536 U.S. 101 (2002*).*

8       United States Supreme Court <u>does recognize systemic violations</u>, which involve the

9   continuing policy or practice of discrimination *"<u>on a company-wide basis</u>"*--which policy or

10  practice continues into the statutory period, as has been alleged in this complaint.

11          <u>See</u>, *"The Continuing Violations Doctrine",* Kyle Graham, 43 Gonz. L. Rev. 271 (2008):

12          *<u>http://digitalcommons.law.scu.edu/cgi/viewcontent.cgi?article=1024&context=fa</u>*

13          *<u>cpubs</u>*

14

15          As the Supreme Court also explained more than 50 years ago in *Lawlor v. National Screen*

    *Service Corp.,* 349 U.S. 322 (1955), *"res judicata* does not bar a suit, even if it involves the same

16

    course of wrongful conduct as alleged earlier, **so long as the suit alleges new facts or a worsening**

17

    **of the earlier conditions, which is precisely the case in this lawsuit at this Court at this time.**

18          Many of the alleged *"continuing later (since 2015) and latest (<u>until 2020</u>) violations"* in

19  this lawsuit were not even ripe for judicial review during 2014/2015 period, and therefore, <u>unripe</u>

20  <u>claims cannot later serve as a basis for *res judicata*.</u> (see, *Rawe v. Liberty Mut. Fire Ins. Co.,* 462

21  F.3d 521, 529–30 (6th Cir. 2006).

22          **Therefore, a new determination at this State Superior Court is warranted in order to**

23  **take account of an intervening change in the applicable legal context or otherwise to avoid**

1   **inequitable administration of the laws, given the gravely affecting worsening continuing**

2   **illegal violations until 2020.**

3        Plaintiff originally alleges in this complaint that due to defendant Dr. Cynthia Morton's

4   (BWH/HMS) 2004 initiation and perpetuation (*as an out-going and willing co-conspirator in the*

5   *alleged race and class based conspiratorial collusion with Yale University School of Medicine*) of

6   ceaseless and reckless coercive reprisals against plaintiff's various professional candidacies at her

7   as well as Dr. Richard Maas's (defendant) laboratory at BWH/HMS and at other laboratories as

8   well at HMS as a whole, as acts of continuing coercion and reprisals, which now, "*as a ceaseless*

9   *domino effect*" has caused "permanent loss" of plaintiff's high-paying and in-demand professional

10  clinical cytogenetics career as well as related medical genetics career, consequently, it has

11  irreversibly damaged his personal life due to deprivation of income, **rendering him in a**

12  **financially dire situation today, as has been attested to at this Court.**

13

14  -----------------------------------------------------------------------------------------------------------

15                                    **INJURY**

16                          ***ENTITLEMENT FOR RELIEF***

17  ***Plaintiff is entitled for relief for:***

18      1. The alleged "*continuing reckless race and class- based conspiratorial collusion,*

19          *coercion and the continuing retaliatory employment discrimination*" at Harvard

20          Medical School by Harvard University- tenured senior faculty members: defendants,

21          Dr. Morton (BWH), Dr. Maas (BWH), Dr.  Irons (CHB), Dr. MacDonald (MGH) as

22          well as co-conspirators, Dr. Pober (CHB), Dr. MacDonald (MGH) and  others at

23          Harvard against plaintiff Dr. Rafi's professional clinical cytogenetics, medical genetics

24          research and molecular genetic diagnostic employment opportunities and training-

25          opportunities from 2004 through 2020- has gravely violated plaintiff's Civil Rights and

26          Constitutional Rights for such a prolonged period.  This is indeed akin to "*ruthless and*

27          *reckless enslavement of colored -Asian of East Indian- non-caucasian- minority race*

60

and class- individual who is also of minority Islamic / Muslim faith". Consequently, "*as a domino effect*", these continuing violations have in-turn permanently destroyed plaintiff's professional clinical cytogenetics and medical genetics job opportunities *around the nation as well to this day.*

2. Consequently, plaintiff is shunned among the professional cytogenetics and medical genetics communities at the national level *as an escaped slave and pariah.* This has caused permanent destruction of not only plaintiff's high-paying and in-demand professional clinical cytogenetics career, medical genetics career and additional training opportunities, rendering him as a *"pauper"* today.

3. These egregious race and class based conspiratorial collusion, coercion, and continuing vindictive retaliatory employment discrimination- are indeed actionable under 42 U.S.C. § 1985.

4. Additionally, the alleged reckless neglect / refusal by defendants, Dr. Morton, Dr. Maas and Dr. Irons, and Dr. MacDonald at Harvard Medical School to prevent the alleged on-going conspiratorial coercive and vindictive retaliatory employment discrimination is additionally actionable under 42 U.S.C. § 1986.

## **DEMAND FOR RELIEF**

(a) Per EEOC, whenever discrimination is found, the goal of the law is to put the victim of discrimination in the same position (or nearly the same) that he or she would have been if the discrimination had never occurred, and the types of relief will depend upon the discriminatory action and the effect it had on the victim.

(b) Accordingly, plaintiff requests the Court / Jury to judge and grant appropriate amount of monetary compensation as a relief as well as *"reparations for the alleged white-collar slavery".*

61

1     (1) The conspiratorial nature and the consequential reckless continuing misconduct in

2       total disregard for plaintiff's Civil Rights as well as the Constitutional Rights for

3       such a prolonged period, since 2004 to this date; and,

4     (2) The alleged misconduct's irreversible detrimental effects, as outlined under the

5       title "Injury" above.

6  **1.**  Equitable Relief:

7    Total compensation for lost wages to be reliably based on the following: The median total

8    annual compensation (salary) for North East region of US being $153,837, *per Graph 2.6:*

9    *PhD Salaries by Years of Experience and Gender (Page 55), and per Table 2.7: PhD*

10    *Salaries by Region (Pages 55-56): American College of Medical Genetics and Genomics,*

11    *2011 Salary Survey Report, May 2012; (**Exhibit 3**).*

12  **2.**  Compensation for Future Losses to be reliably based on the following:

13    Per Table 2.8: PhD Salaries by Region and Experience (pages 57-58), American College

14    of Medical Genetics and Genomics, 2011 Salary Survey Report, May 2012 (***Exhibit 16***).

15  *3.*  Compensation for emotional distress and suffering: to be determined by Jury.

16  **4.**  Punitive Damages given the continuing reckless indifference and malice, and as deterrence:

17    **to be determined by Jury.**

18  **6.**  Appropriate equitable relief against defendant as allowed by the Civil Rights Act of 1871:

19    including the enjoining, and permanent restraining of these egregious violations in total

20    disregard for plaintiff's Civil Rights as well as the Constitutional Rights, and direction to

21    defendants to take such affirmative actions as is necessary to ensure that the effects of the

22    unconstitutional and unlawful practices are eliminated, and do not continue to affect

23    plaintiff's or others' employment opportunities.

1     **7.**  Attorney's fees and costs, if appointed or availed, pursuant to Civil Rights Act of 1871, 42

2     U.S.C. § 1988, and

3     **8.**  For such other and further relief to plaintiff may show himself justly entitled.

4     <u>**REQUEST FOR TRIAL BY JURY**</u>

5     ***Plaintiff requests trial by jury on all matters so triable.***

6     The founding fathers have believed that the right to be tried by a jury of your peers was so

7     important that it has merited inclusion in the highest law of the land. *Amendment VII states that*

8     *in suits at common law, where the value in controversy shall exceed twenty dollars, the right of*

9     *trial by jury shall be preserved.*  The founding fathers have included jury trials in the constitution

10     because jury trials prevent tyranny since citizens on the jury are given the absolute power.

11     **Therefore, plaintiff requests a trial by jury <u>*given*</u>:**

12     (1) The high volume of evidencing (*presented herewith and will additionally be presenting*

13     *during the trail along with testimonials and affidavits*) as multiple exhibits

14     corroborating his allegations in this case;

15     (2) His demanded relief for lost professional pay and salary from 2004 through 2020, as is

16     reflected in his Social Security- annual earnings from 2004 through 2020; and

17     (3) The assessment of the matter in controversy to exceed by far the sum value of $75,000

18     exclusive of interest and costs.

19

20     <u>**REQUEST FOR COURT APPOINTED *PRO BONO* ATTORNEY**</u>

21     Plaintiff, being non-attorney *pro se*, requests legal guidance and assistance from Court

22     appointed *pro bona* legal counsel to assist plaintiff with this complaint and the trial process, since

23     plaintiff's attempts to bring on board an attorney to represent him have not been successful.  In

24     accordance with § 1915(e) (1) any court of the United States may authorize and request an attorney

25     to represent any person unable to afford counsel.

1    Accordingly, *Pro Se* plaintiff hereby respectfully requests the Court to assign a *pro bono*

2    lawyer from this Count's *pro bono* panel in the interest of justice and equal representation,

3    **given:**

4         (1) The fact that *pro se* plaintiff's native language is NOT English;

5         (2) The complexity of the issues, facts and the alleged extensive and continuing damage

6              caused by the brazen disregard for plaintiff's Constitutional and Civil Rights;

7         (3) The type and extent of discovery involved in the case in addition to the volumes of

8              exhibits already presented herein; and

9         (4) Plaintiff's extensive effort to find a *pro bono* attorney through LegalMatch and

10             charity legal organizations having not yielded legal representation on *pro bono* basis.

11

12                    **DECLARATION UNDER PENALTY OF PE RJURY**

13        The undersigned declares that he has read the above complaint, and that the information

14   contained therein is true and correct to the best of his knowledge and understanding.

15        Respectfully submitted,

16

17   ------------------------------                          Date: January 20, 2020

18   Syed K. Rafi, PhD.

19   *Pro se* Plaintiff

20   3237 Apex Cir,

21   Falls Church, VA 22044

22   rafigene@yahoo.com

23   Phone: 816 787 4366

24

25

26   **EXHIBITS: 1 through 23: E-Discovery material:**

27                              *more than 300 pages will be submitted via CMECF*

28                              *system upon the Court's granting of CMECF access*

29                              *to pro se plaintiff.*

30

64